WINDOM, Judge.
Heath Lavon McCray appeals his capital-murder conviction and sentence of death. McCray was convicted of murder made capital because it was committed during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975. After the penalty phase of the trial, see §§ 13A-5-45 and -46, Ala.Code 1975, the jury unanimously recommended that McCray be sentenced to death. After receiving a presentence report and conducting a separate sentencing hearing, see § 13A-5-47, Ala.Code 1975, the trial court followed the jury’s recommendation and sentenced McCray to death.
The evidence adduced at trial indicated the following. On Wednesday, August 10, 2005, Brandy Jean Bachelder’s body was found in her mobile home in the Cayman Bay Trailer Park in Dothan. Testimony indicated that Bachelder had been living with McCray for approximately a year and a half before her death, but that on Thursday, August 4, 2005, Bachelder had asked McCray to move out of the mobile home.
Rolande Dean, Bachelder’s mother, testified that she had visited her daughter at her mobile home on Thursday, August 4, 2005, at which time Bachelder told McCray that he had to leave. According to Dean, McCray left with a bag of clothing. After McCray left, Bachelder left the mobile home for a short time and returned with two new door knobs to replace the door knobs on the front and back doors of the mobile home. Dean said that she noticed that night that Bachelder and McCray were interacting differently than they had previously and that it appeared as if Ba-chelder was afraid of McCray.
Dean testified that she spoke with Ba-chelder on the telephone the next day, as well as on Saturday and Sunday, and that she saw Bachelder the morning of Monday, August 8, 2005, before Bachelder took her son to school and then went to work at the local Family Dollar discount store. Dean also said that she spoke with Ba-chelder during the day on Monday while Bachelder was at work. She tried telephoning Bachelder Monday night, Tuesday during the day, and Tuesday night, but was unable to reach her. On Wednesday, August 10, 2005, Dean went to the Family Dollar store to look for Bachelder, who was supposed to work that day, but she was not there. Dean then went to Ba-chelder’s mobile home, saw blood on the front door, and notified the manager of the trailer park, who notified police.
Tim Miller, an officer with the Dothan Police Department, testified that on August 10, 2005, he went to the Cayman Bay Trailer Park and spoke with the manager and with Dean, who was visibly upset. Officer Miller saw bloodstains on the front door, which was locked,[1] so he used a cement block he found on the ground to force the front door open. Immediately upon the door opening, Officer Miller saw “blood everywhere.” (R. 401.) Miller stated there was blood all over the living-room floor and all over the couch in the living room, and that there was a blood trail through the kitchen and down the hallway. The blood trail appeared to be from someone being dragged; he found Bachelder’s body lying in the hallway. After finding her body, Officer Miller secured the scene, and several other police officers and paramedics arrived. There did not appear to be any lights on in the mobile home when he entered and he saw footprints in the blood trail leading down the hallway. A dog was shut inside one of *9 the bedrooms and was later removed from the scene.
The State’s theory of the case was that two days before Bachelder’s body was found, while Bachelder was at work, McCray broke into Bachelder’s mobile home using a screwdriver. McCray then locked Bachelder’s dog in a bedroom and stripped down to his underwear to avoid contaminating his clothing. McCray then unscrewed all the light bulbs in the mobile home so that it would be dark inside when Bachelder got home and removed the batteries from the cordless telephone so she could not call for help. After disabling the lights and telephone, McCray waited for Bachelder to arrive home, at which point he brutally attacked her with a butcher knife as revenge for ending their relationship. McCray covered his hands with a pair of socks to avoid leaving his fingerprints at the scene and following the attack washed the blood off his body in the bathtub, got dressed, and fled the scene.
Mike Etress, a corporal with the criminal investigations division of the Dothan Police Department, was in charge of the investigation and went to the scene the day Bachelder was found. He testified that there was a large amount of blood throughout Bachelder’s mobile home and that various items in the mobile home were strewn about indicating that a struggle had taken place. In addition, Cpl. Etress noticed there were several footprints in the blood throughout the mobile home. The floor of the mobile home had a type of tile that is secured with adhesive, so Cpl. Etress was able to remove 12 of the tiles containing the footprints and secure them as evidence. He also took several samples of the blood from various locations in the mobile home. There were no lights on in the mobile home when he arrived, and, when he checked the lights, he discovered that all but one of the light bulbs in the mobile home had been unscrewed to stop them from working. The only working light bulb in the mobile home was in the hood over the oven. Cpl. Etress collected the light bulbs in the mobile home as evidence. He also found a pair of socks on the living-room floor lying in blood, a Pepsi brand soda bottle lying in blood on the living-room floor, a cordless telephone with the batteries removed lying on the living-room floor, and a butcher knife — believed to be the murder weapon — lying on the sofa, all of which were collected and secured as evidence. One of the drawers in the kitchen, which contained kitchen utensils, was open and there was a pool of blood in it. Blood was also found in the bathroom, but the blood in the bathroom appeared to be diluted, as if someone had tried to wash off blood in the bathtub. No box cutter was found in the mobile home.[2]
Cpl. Etress described the condition of Bachelder’s body, both when he arrived at the scene and when he attended the autopsy the following day. Bachelder had a plastic bag secured tightly around her head; a black dog leash was looped into a noose around her neck. Bachelder’s shorts were down around her ankles, her underwear had been torn in half, and she was covered in blood. He observed several stab wounds to Bachelder’s neck and chest, as well as several cuts on her fingers and a deep wound between her forefinger and thumb that went almost to the bone. During the autopsy, Cpl. Etress again saw the wounds to Bachelder’s neck, which appeared consistent in width with the butcher knife that had been found on *10 the sofa. He also saw a knife wound near Bachelder’s elbow that went completely through her arm. That wound was also consistent in width to the butcher knife. Cpl. Etress further described the numerous wounds to Bachelder’s hands as defensive wounds that occurred when Bachelder “had grabbed the knife while she was being stabbed.” (R. 594.) He also saw several puncture wounds to Bachelder’s chest, including one to her left breast that went “completely through” the breast. (R. 595.) The width of that wound was consistent with the width of the butcher knife found at the scene.
Dr. Stephen Boudreau, a medical examiner with the Alabama Department of Forensic Sciences (“DFS”), testified that he was present when the autopsy was performed on Bachelder on August 11, 2005.[3] Bachelder had several wounds to her hands — a deep gash on her right hand at the base of her thumb, a continuous gash across the middle of three of the fingers on her left hand, and a gash along the side of her left hand — all of which, Dr. Boudreau said, would have caused Bachelder pain and severe bleeding. The gash across the fingers on Bachelder’s left hand was most likely caused by Bachelder grabbing a sharp object. In addition, Bachelder had wounds to her arms — one large stab wound to her left elbow that began on the top of the elbow and went completely through to the underside of the upper part of the arm, as well as a deep cut on her forearm. Both arm wounds were consistent with having been caused by the butcher knife found at the scene and would also have caused pain and severe bleeding. Bachelder had two deep stab wounds and several superficial cuts on her neck, all of which were consistent with having been caused by the butcher knife at the scene and would have caused pain and severe bleeding. One of the deep stab wounds on the right side of the neck actually cut Bachelder’s carotid artery, which would have caused blood to “spurt” in all directions. (R. 759.) Based on the location and direction of the wounds on Bachelder’s neck, they were all inflicted separately. Bachelder also had wounds to her breast and genitals. Specifically, Bachelder suffered a stab wound to her left breast that began on the underside of the breast and penetrated through the entire breast tissue, ending on the top part of the breast. This wound was at least four inches long and was also consistent with having been caused by the butcher knife found at the scene. Dr. Boudreau also stated that this wound would have been “very painful” and would have caused bleeding. (R. 771.) In addition, Bachelder also suffered a cut that “went up through the wall of the vagina.” (R. 779.) This particular wound was also consistent with having been made by the butcher knife found at the scene; “[m]ost assuredly” would have been painful; would have caused bleeding; and could have caused death eventually if left untreated, but that it was not the cause of Bachelder’s death. (R. 779.)
Bachelder had a total of nine “major” stab wounds as well as numerous other superficial stab wounds and cuts on her body. (R. 778.) Bachelder also had numerous bruises and contusions on her body, including on her neck, arms, hands, torso, and legs. The bruises on Bachelder’s neck were consistent with having been caused by the dog leash that had been found around her neck. Based on his examination of the wounds, Dr. Boudreau believed that Bachelder was alive when all the wounds were inflicted and that the wound on the neck that cut the carotid *11 artery was ultimately the fatal wound. Dr. Boudreau opined that the cause of Bachelder’s death was exsanguination and that, depending on the sequence of the wounds, Bachelder could have survived anywhere from a few minutes to over 15 minutes before she died.
Kristen Maturi, a forensic biologist with DFS, testified that some of the blood samples taken from Bachelder’s mobile home matched her DNA and that some of the blood samples taken from Bachelder’s mobile home consisted of a mixture of two DNA profiles — Bachelder’s and McCray’s. Both Bachelder’s and McCray’s DNA were found on the blade of the butcher knife. Shannon Fitzgerald, a certified latent-print examiner with the Alabama Bureau of Investigation, testified that he matched the footprints on the tiles from the mobile home to the known footprints of McCray, which had been taken after his arrest. He also tested 13 light bulbs from the scene and obtained a latent print from 1 bulb, which matched McCray’s known thumbprint. Finally, he compared latent prints found on Bachelder’s telephone to McCray’s known fingerprints and found that a print on the telephone matched McCray’s thumbprint.
Frank Meredith, a detective with the Dothan Police Department, testified that at approximately 1:00 p.m. on the afternoon that Baehelder’s body was found, McCray voluntarily came to the police station as a result of a BOLO (“be on the lookout”) that had been issued for him that morning. Detective Meredith initially escorted McCray to the conference room of the investigations division and advised McCray of his Miranda[4] rights, although when McCray initially arrived he was not under arrest and was free to leave at any time. Detective Meredith testified that McCray indicated that he understood his rights, agreed to waive his rights, and did not appear to be under the influence of alcohol or narcotics. Detective Meredith further testified that neither he nor the other officer present promised McCray anything in order to get McCray to make a statement.
When speaking with McCray, Detective Meredith noticed a long scratch on McCray’s neck. McCray told Detective Meredith that he had scraped his neck in an attic where he was spraying insulation. At approximately 3:00 p.m. that afternoon, Detective Meredith obtained consent from McCray to take a DNA sample from him. McCray subsequently gave a recorded statement to Detective Meredith and Michael Cirulli, a sergeant with the Dothan Police Department, at approximately 7:00 p.m. that evening.[5]
In his recorded statement, McCray provided several different versions of the events of Monday, August 8, 2005. McCray initially denied being present at Bachelder’s mobile home or even seeing or speaking with Bachelder that day. He said that he and Bachelder were together the Friday night before her murder and had gone bowling. Afterwards, he claimed that he and Bachelder had had consensual sex and that he had spent the night at Bachelder’s mobile home. McCray stated that the next morning Bachelder drove him to his mother’s house and dropped him off. McCray said that he did not see or speak with Bachelder again that Saturday, but that on the Sunday morning be *12 fore her murder, she came to his mother’s house to see him. McCray stated that the Sunday morning before Bachelder’s murder was the last time he saw or spoke to her. After further questioning, McCray changed his story and stated that he had spoken with Baehelder on the telephone on Sunday afternoon. Later in his statement, McCray again changed his story, admitting that he went to Bachelder’s mobile home Monday afternoon. McCray said that he had spoken to Baehelder on the telephone Monday morning while she was at work and that they had agreed to meet that evening at Bachelder’s mobile home. According to McCray, because he had lost his key to the mobile home, he told Baehelder that he would use a screwdriver to enter the mobile home when he got off work that afternoon and would then wait for her to come home from work. McCray said that he arrived at Bachelder’s mobile home about 4:00 p.m. and watched television until Baehelder got home from work at approximately 7:30 p.m., at which point, he and Baehelder talked for about an hour and he then left and walked to his nephew’s apartment.
■With respect to the cut on his hand and the scratches on his neck, McCray gave varying explanations throughout his recorded statement. McCray first said that he had cut his hand on Monday night while working on his nephew’s automobile. However, after being confronted with the fact that his nephew had told law-enforcement officers that McCray had not recently worked on his automobile, McCray then stated that he had cut his hand when he was walking from Bachelder’s mobile home to his nephew’s apartment that Monday night. Specifically, McCray stated that while walking to his nephew’s apartment, he tried to break up a fight between two men, one of whom had a knife and cut his hand. Later in his statement, McCray said that he had intentionally cut his own hand with a piece of glass he had found lying on the ground after he had left Ba-chelder’s mobile home Monday night. Finally, McCray stated that he had intentionally cut his own hand with a butcher knife while he was at Bachelder’s mobile home because he was so upset that their relationship had ended. McCray also initially said that he had scratched his neck on some conduit while at work, but then changed his story and said one of his young nephews had accidentally scratched his neck while they were wrestling. Throughout his recorded statement, McCray denied any involvement in Ba-chelder’s murder.
To establish the falsity of McCray’s varying stories in his recorded statement, the State presented testimony from Al-phonzo Sanders, McCray’s nephew, who stated that McCray had not worked on his automobile in the days surrounding Ba-chelder’s murder. Sanders said that McCray had telephoned him on Monday, August 8, 2005, at approximately 5:00 p.m. and asked him if he was going to be home later that evening. At approximately 9:00 p.m. that night, McCray came to his apartment. Sanders saw scratches on McCray’s neck and a cut on McCray’s hand. According to Sanders, McCray said that he had been with a woman and was caught by the woman’s boyfriend or husband, who pulled a knife on him and cut him. Sanders took McCray to the hospital for treatment for the cut.
Avery Lerenzo Sanders, another of McCray’s nephews, testified that he was at his brother’s apartment Monday, August 8, 2005, when McCray came over. Avery Sanders also saw a cut on McCray’s hand and heard McCray say that he had been with a woman and was caught by the woman’s boyfriend or husband, who pulled a knife and cut him.
*13 Zaccheus McCray, who was not related to McCray, but was a coworker of McCray’s at Southeast Construction, testified that he worked with McCray on Monday, August 8, 2005. Zaccheus said he saw no cuts or scratches on McCray at that time and that McCray did not suffer any cuts or scratches while working that day. After work that afternoon, he drove McCray to the Cayman Bay Trailer Park and dropped him off. The following morning, McCray arrived at work with what appeared to be fingernail scratches on his neck. When asked how he got the scratches, McCray told Zaccheus that he had been “tussling” with his nephews the night before and had accidentally gotten scratched by their fingernails. (R. 859.) After work on Tuesday, August 8, 2005, he drove McCray to McCray’s mother’s house in Ashford and dropped him off.
The main defense theory of the case was heat of passion — specifically, that McCray had gone to Bachelder’s mobile home, with permission, simply to talk to her and that Bachelder had attacked him with the butcher knife, at which point he lost control and stabbed her to death. McCray testified on his own behalf. He stated that he and two of his three sons had lived with Bachelder at her mobile home for approximately a year and a half before her death. He said that his relationship with Bachelder was calm in the beginning but that when he started speaking to, and seeing more of, his ex-wife, Tammy Tidwell, their relationship changed, and Bachelder would get aggravated easily and “was mean to [him].” (R. 876.) According to McCray, Bachelder always carried a box cutter on her person, and sometimes she would take it out and say she was going to cut him with it. In early August 2005, McCray said, he moved out of Bachelder’s mobile home. He testified that he and Bachelder had purchased a van together but that he had missed some payments and the van had been repossessed. He and Bachelder had discussed the situation the week before her death, on a Monday evening, not Thursday evening as Bachelder’s mother testified, and they had agreed that he and his sons should leave and move in with his mother. On Tuesday, McCray said, he packed his clothing and his two sons’ clothing, and Tidwell and a friend helped him move to his mother’s residence. McCray said that he did not take everything he owned from the mobile home at that time, only clothing.
According to McCray, the Friday night before her death, he and Bachelder went bowling together. Afterwards, he spent the night with Bachelder at the mobile home. The following morning, Bachelder drove him to his mother’s house and then went to work. On Sunday morning, McCray said, Bachelder-came to his mother’s house and they spoke for about an hour before Bachelder went to work. McCray said that he did not see or speak with Bachelder again that day.
McCray testified that on Monday, August 8, 2005, a coworker drove him to Bachelder’s mobile home after work, at approximately 3:00 p.m., so that he could speak to her about her son. Because he had lost his key to the mobile home approximately two weeks before he moved out, he used a screwdriver to gain entrance to the mobile home, like he had done in the past. According to McCray, he watched television until Bachelder got home from work between 7:30 p.m. and 8:00 p.m., at which point they talked. McCray stated that the conversation was initially calm, but when he mentioned his ex-wife, Bachelder got “really upset” and they got into a physical altercation. (R. 891.) McCray claimed that Bachelder swung her hand and scratched him on his neck with her fingernails. According to McCray, Bachelder then got a knife out of *14 a drawer in the kitchen and swung it at him. McCray claimed that he put his arm up to block the knife and was cut on his right hand.
McCray testified that he then became angry and “lost it.” (R. 896.) McCray said that he got the knife out of Bachelder’s hand and began cutting her. He could not remember how many times he had cut or stabbed Bachelder, but he believed it was more than once. McCray admitted that when the altercation first began— before Bachelder had allegedly gotten the knife — he had grabbed a dog leash that was hanging on the wall and had wrapped it around Bachelder’s neck. He remembered dragging Bachelder around the mobile home by the dog leash around her neck, but he did not recall putting the plastic bag over her head. McCray denied that he had covered his hands during the fight, but admitted that he had washed his hands after he killed Bachelder. When he first arrived at Baehelder’s mobile home, he took off his pants and his shoes and socks, and when Bachelder got home, he was clad only in his underwear and a t-shirt. He admitted that it was unusual that light bulbs inside Bachelder’s mobile home would all be unscrewed, but nonetheless he and Bachelder had had problems in the past with light fixtures, particularly with the ceiling fan in the living room. According to McCray, the light fixture in the ceiling fan was broken, and the only way to turn the light off was to unscrew the light bulb. McCray denied having had any contact, either with his body or with any object, with Baehelder’s genital area during the fight.
McCray testified that he did not remember what time he left Bachelder’s home that night but that when he left, he walked to his nephew’s apartment. His nephew drove him to a friend’s house, who was not at home at the time, and then to his mother’s house, where he checked on his children. After checking on his children, McCray asked his nephew to take him to the medical center, where he received stitches to his hand. He then went back to his mother’s house and watched television with his children. McCray did not tell anyone about what had happened, and he went to work the next day, Tuesday, and again on Wednesday.
McCray said that he left work early on Wednesday and went to the police station, where he was questioned. He admitted that he initially lied to the police about the scratches on his neck and the cut on his hand and that he lied when he told police he had not seen Bachelder that Monday.
On cross-examination, McCray admitted that he had lied to the police repeatedly during his recorded statement and that he had also lied to his nephews and to the doctors at the medical center about the cuts, all in an effort to protect himself. McCray admitted that nothing had prevented him from leaving Bachelder’s mobile home during his fight with Bachelder. He also admitted that he had put on his pants, shoes, socks, and another shirt over his T-shirt before he had left so that no one would see the blood. He further admitted that after he had left that night, he put the clothing he had been wearing that day in the garbage. He also changed his testimony and admitted to putting the plastic bag over Bachelder’s head. McCray said that, while he was stabbing Bachelder, she opened the front door in an effort to escape, but he dragged her back into the mobile home by the dog leash. McCray also admitted that Bachelder was screaming and begging for her life when he was repeatedly stabbing her, but that he wanted Bachelder to die so that she could not identify him. Finally, McCray admitted that he had a previous conviction for domestic violence in the second degree *15 relating to an incident with his ex-wife. McCray stated that he had held a knife to Tidwell’s throat and that he had pleaded guilty to the domestic-violence charge, but he denied that he had actually cut Tid-well’s throat or hand.

Standard of Review

Because McCray has been sentenced to death, according to Rule 45A, Ala. R.App. P., this Court must search the record for “plain error.” Rule 45A states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
(Emphasis ádded.)
In Ex parte Brown, 11 So.3d 933 (Ala.2008), the Alabama Supreme Court explained:
“ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.”’ Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App. 1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
“ ‘The Rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163 [102 S.Ct. 1584, 71 L.Ed.2d 816] (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [56 S.Ct. 391, 80 L.Ed. 555 (1936)]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S., at 163, n. 14.’
“See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would ‘seriously affect the fairness or integrity of the judicial proceedings,’ and that the plain-error doctrine is to be ‘used sparingly, solely in those circumstances in which a miscar-riáge of justice would otherwise result’ (internal quotation marks omitted)).”
11 So.3d at 938. “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001). Although McCray’s failure to object at trial will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992).
I.
McCray first contends that the State exercised its peremptory strikes in a discriminatory manner against both African-Americans and women, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), and that this Court should remand this cause for a hearing at which the State would be required to provide race-neutral and gender-neutral reasons for its strikes. This Court disagrees.
*16 The initial list of prospective jurors contained in the record consists of 236 names. However, the strike list contained only 128 names, and prospective jurors nos. 101 through 128 on that list are crossed out with a large “X,” indicating that those prospective jurors were not on the venire panel for McCray’s trial. In addition, 30 of the first 100 names listed on the strike list are crossed out with no explanation.[6] Although the transcript indicates that the roll of prospective jurors was called at the beginning of voir dire, the court reporter did not transcribe the roll call. Therefore, this Court cannot positively determine whether all 100 veniremembers listed on the jury strike list were present at the beginning of voir dire or whether only the 70 prospective jurors whose names were not crossed out were present. However, given that the trial court granted McCray’s pretrial motion for a full recor-dation of all the proceedings,[7] that the trial court stated after the roll call that all prospective jurors were present, that none of the 30 names that are crossed out on the jury strike list appear anywhere in the transcript, and that neither party makes any argument (or even acknowledges) these 30 prospective jurors whose names are crossed out on the strike list, this Court must presume that those 30 prospective jurors were excused before voir dire ever began, and that only 70 venire-members appeared for voir dire.
Of those initial 70 veniremembers, there were 34 men, 36 women, 57 Caucasians, 12 African-Americans, and 1 whose race was listed on the venire list as “other.” (C. 366-89.) The transcript indicates that after the trial court’s initial qualification and questioning of the venire, the court excused 11 prospective jurors for medical, employment, and personal reasons. Of those 11 jurors, 6 were men, 5 were women, 7 were Caucasian, and 4 were African-American. Additionally, following a lunch break (which occurred during the defense’s voir dire questioning), the trial court excused another juror, a Caucasian male, for being late returning from the lunch break. After the trial court’s excusáis, 58 venire-members remained, of whom 27 were men, 31 were women, 49 were Caucasian, 8 were African-American, and 1 was another race. The record indicates that after the group and individual voir dire questioning,[8] the trial court granted 15 challenges for cause. Those jurors removed for cause included 4 men, 11 women, 9 Caucasians, 5 African-Americans, and the prospective juror whose race was listed as “other.” All five African-Americans removed for cause were challenged by the State.
*17 Following the challenges for cause, 43 veniremembers remained, from which the parties struck the jury. Of those 43, 23 were men, 20 were women, 40 were Caucasian, and 3 were African-American. The State was given 16 peremptory strikes and the defense 15 peremptory strikes, with the last strike of each party sitting as an alternate. The State used 11 of its 16 strikes to remove women and 2 of its strikes to remove African-Americans. The defense used 11 of its 15 strikes to remove men and all of its strikes to remove Caucasians. McCray’s jury consisted of 8 men, 4 women, 11 Caucasians, and 1 African-American, and 1 alternate was a Caucasian female and the other alternate was a Caucasian male.
After the jury was struck, McCray made a timely Batson motion, arguing that the State had struck two of the only three African-Americans remaining on the veni-re after excusáis and challenges for cause.[9] After questioning by the trial court, defense counsel also noted that the State had used its fourth and seventh strikes against those prospective African-American jurors. The trial court denied the motion, finding that McCray had failed to establish a prima facie case of racial discrimination on the part of the State. McCray did not make a J.E.B. motion in the trial court.
“ ‘When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.’ ” Vanpelt v. State, 74 So.3d 32, 54 (Ala.Crim.App.2009) (quoting Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App.2001)). “To find plain error in the context of a Batson or J.E.B. violation, the record must supply an inference that the prosecutor was ‘engaged in the practice of purposeful discrimination.’ ” Blackmon v. State, 7 So.3d 397, 425 (Ala.Crim.App.2005) (quoting Ex parte Watkins, 509 So.2d 1074, 1076 (Ala.1987)). See also Saunders v. State, 10 So.3d 53, 78 (Ala.Crim.App.2007) (“For an appellate court to find plain error in the Batson [or J.E.B.] context, the court must find that the record raises an inference of purposeful discrimination by the State in the exercise of peremptory challenges.”).
In evaluating a Batson, or J.E.B., claim, a three-step process must be followed. As the United States Supreme Court explained in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003):
“First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [Batson v. Kentucky,] 476 U.S. [79,] 96-97 [, 106 S.Ct. 1712, 1723 (1986) ]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98. Third, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98.”
537 U.S. at 328-29, 123 S.Ct. 1029.
With respect to the first step of the process — the step at issue here in both the Batson and J.E.B. contexts — “[t]he party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination.” Ex parte Brooks, 695 So.2d 184, 190 (Ala.1997). “A defendant makes out a pri-ma facie case of discriminatory jury selection by ‘the totality of the relevant facts’ surrounding a prosecutor’s conduct during *18 the defendant’s trial.” Lewis v. State, 24 So.3d 480, 489 (Ala.Crim.App.2006) (quoting Batson, supra at 94, 106 S.Ct. 1712), aff'd, 24 So.3d 540 (Ala.2009). “In determining whether there is a prima facie case, the court is to consider ‘all relevant circumstances’ which could lead to an inference of discrimination.” Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). In Ex parte Branch, the Alabama Supreme Court specifically set forth a number of “relevant circumstances” to consider in determining whether a prima facie case of racial discrimination has been established:
“The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
“1. Evidence that the ‘jurors in question share[d] only this one characteristic — their membership in the group— and that in all other respects they [were] as heterogeneous as the community as a whole.’ [People v.] Wheeler, 22 Cal.3d [258] at 280, 583 P.2d [748] at 764, 148 Cal.Rptr. [890] at 905 [ (1978) ]. For instance ‘it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,’ Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
“2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
“3. The past conduct of the state’s attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ].
“4. The type and manner of the state’s attorney’s questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
“5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355, (Fla.Dist.Ct.App.1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
“6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
“7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
“8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. [229] at 242, 96 S.Ct. [2040] at 2049 [48 L.Ed.2d 597 (1976) ].
“9. The state used peremptory challenges to dismiss all or most black jurors. See Slappy, 503 So.2d at 354, Turner, supra.”
526 So.2d at 622-23. In Ex parte Trawick, 698 So.2d 162 (Ala.1997), the Court reiterated the Ex parte Branch factors in a manner applicable to gender as follows:
*19 “(1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as hete-rogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state’s attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state’s questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender.”
698 So.2d at 168.
With these principles in mind, this Court will address each of McCray’s claims in turn.
A.
McCray first argues that the State exercised its peremptory strikes in a discriminatory manner against women. Because this claim is being raised for the first time on appeal, this Court reviews it for plain error only. See Rule 45A, Ala. RApp. P. Specifically, McCray contends that the record raises an inference of purposeful discrimination on the part of the State because almost all the factors listed in Ex parte Branch and Ex parte Trawick are present in his case. This Court disagrees.
In support of his argument, McCray asserts that the number and pattern of the State’s strikes support an inference of discrimination against women. As noted above, the State used 11 of its 16 peremptory strikes to remove women from the venire. However, the State’s first two strikes were against men, the next five strikes were against women, the next two were strikes against men, and the final seven strikes were against women. Because there was no apparent pattern of strikes against women, the State’s use of 11 of its 16 peremptory strikes against women does not raise an inference of gender discrimination. See Ex parte Land, 678 So.2d 224, 246 (Ala.1996) (holding that the State’s use of 11 of its 14 peremptory strikes against whites did not raise an inference that the State purposefully discriminated against whites). In addition, the defense used 11 of its 15 strikes against men, striking only 4 women, and 4 women ultimately sat on McCray’s jury, with one of the alternates also being a woman.
McCray also argues that the Houston County District Attorney’s Office “has a long history of using its peremptory challenges in a discriminatory manner.” (McCray’s brief, at 16.) Although McCray cites to numerous opinions from this Court, in which this Court either reversed a defendant’s conviction on the ground that the Houston County District Attorney’s Office had discriminated against African-Americans in using its peremptory strikes or remanded the cause for a hearing on a claim that the Houston County District Attorney’s Office had discriminated against African-Americans in using its peremptory strikes, McCray cites to only a single case, Morris v. City of Dothan, 659 So.2d 979 (Ala.Crim.App.1994), from Houston County involving gender discrimination. This Court’s opinion in Morris, 659 So.2d at 979, however, resulted from an appeal from a municipal conviction that the Houston County District Attor- *20 nejfs Office was not involved in.[10] Although not cited by McCray, in Floyd v. State, [Ms. CR-05-0935, September 28, 2007] — So.3d-(Ala.Crim.App.2007), this Court remanded for a hearing on the defendant’s claim that the Houston County District Attorney’s Office had engaged in gender discrimination; however, on return to remand, this Court upheld the trial court’s finding that the Houston County District Attorney’s Office had not engaged in gender discrimination. As noted in Ex parte Trawick, in determining whether a prima facie case of gender discrimination has been established, courts should look at “the past conduct of the state’s attorney in using peremptory challenges to strike members of one gender.” 698 So.2d at 168 (emphasis added). In this case, McCray has cited nothing indicating a history on the part of the Houston County District Attorney’s Office of engaging in gender discrimination, nor does the record reflect any such history. Therefore, this factor does not support an inference of gender discrimination.
McCray also argues that the women struck by the State shared only the characteristic of gender and were heterogeneous in all other respects, specifically pointing out that the 11 women struck varied in age, race, employment, and marital status. However, there is almost always going to be some variance among prospective jurors who are struck; therefore, this alone does not establish heterogeneity of the struck veniremembers so as to support an inference of discrimination. The question, as noted in both Ex parte Branch and Ex parte Trawick, is whether the struck jurors shared only the characteristic at issue, in this case, gender. The record here does not reflect that the women struck shared only the characteristic of gender. To the contrary, the record reflects that many of the women struck shared similar characteristics other than gender.
For example, three of the women struck had previously sat on criminal juries as alternates but were not aware of the outcome of those trials. Only one other juror had sat on a criminal jury as an alternate, a Caucasian male, but he knew that the trial resulted in a guilty verdict, and he was struck by the defense using its seventh strike. Similarly, the State struck the only two prospective jurors, both women, who had sat on a criminal jury that had ended in a not-guilty verdict or in a hung jury. Although two other jurors who had previously sat on criminal juries, one man and one woman, sat on McCray’s jury, the male juror indicated during voir dire that the defendant in his previous jury service had pleaded guilty before jury deliberations had begun, and the female juror indicated that the jury in her previous service had returned a guilty verdict. Two of the women struck by the State had family members who had been convicted of crimes. In addition, another two of the women struck by the State responded during group voir dire that they had never seen anyone who had ever been cut or stabbed with a knife — only five prospective jurors responded in that manner: two were removed for cause, one was struck by the defense using its eighth strike, and the State struck the only remaining two who had never seen anyone cut or stabbed with a knife. Based on these facts, the women struck by the State in this case were not heterogeneous in all respects but gender; therefore, this factor does not support an inference of discrimination.
*21 McCray also argues that there was a lack of meaningful questioning by the State, indicating an intent to discriminate against women. Although McCray is correct that two of the women struck by the State answered no questions during voir dire and the record reflects that four of the men who ultimately sat on McCray’s jury answered no questions during voir dire,[11] the record also reflects that one of the men struck by the State also answered no questions during voir dire and that three of the four women who sat on McCray’s jury also answered no questions during voir dire. In addition, the record reflects no disparate questioning by the State between male and female jurors. As explained in note 8, supra, after the court and the parties questioned the venire as a whole, 21 veniremembers were also questioned individually. Of those 21, 12 were women and 9 were men. The record reflects that the majority of the individual voir dire questioning was conducted by the trial court and that, in most instances, the parties did not question the jurors. However, the record reflects that the State did pose questions to three of the prospective jurors, two of whom were women. Under these circumstances, this Court does not find that the State’s striking of two women who answered no questions during voir due or anything in the manner or type of questioning by the State during voir dire supports an inference of gender discrimination.
Finally, McCray argues that the State engaged in disparate treatment of male and female jurors, specifically arguing that the State struck one female juror, V.A., who, he says, answered a question during voir dire similarly to a male juror, R.G., who was not struck and who actually sat on McCray’s jury. However, McCray’s argument in this regard is not supported by the record. One of the elements of capital murder the State was required to prove in this case was that McCray had entered or remained unlawfully in Ba-chelder’s mobile home. The State sought to prove that McCray entered or remained unlawfully in the trailer by presenting evidence indicating that McCray had used a screwdriver to break into the mobile home. McCray, on the other hand, asserted that Bachelder had asked him to come to the trailer and had agreed that he could use the screwdriver to enter the trailer. During group voir dire by the State, the following occurred:
“[Prosecutor]: Okay. Let me ask you this, if I could: Anybody that’s ever allowed during your lifetime — just raise your hand. I need you to give me a response, so we can take it down. Anybody that’s ever dated someone, socialized, girlfriend, boyfriend, a common law husband and wife relationship, whatever, that you ever dated someone, and they ever had to use a screwdriver to get into your house? In other words, someone you dated socially, boyfriend, girlfriend — I don’t want to be real specific— but did you have to allow them to use a screwdriver to get into your locked house? Anybody ever do that? Anybody over here?
“PROSPECTIVE JUROR: I lost my key before. My husband [has] had to use a screwdriver to get in.
“[Prosecutor]: Your husband. Right? That’s fíne.
“And your name? I’m sorry, Judge....
“PROSPECTIVE JUROR: It’s [V.A.].
*22 “[Prosecutor]: Thank you, [V.A.] Thank you for standing up.
“How about this side? Anybody’s boyfriend or whatever that needed a screwdriver to break into the house? That’s no. Correct?
“(No response.)
“[Prosecutor]: How about over here?
“PROSPECTIVE JUROR: I’ve had to do it to my own.
“[Prosecutor]: Had to do it to your own house. Your name?
“PROSPECTIVE JUROR: [R.G.].
“[Prosecutor]: [R.G.], you have had to do it to your own house.
“Okay. That would be included — I am talking about you were dating, socializing, whoever it was, they had to use it to get in.”
(R. 78-79.)
It appears from the above-quoted portion of voir dire that the State’s purpose in asking the question above was to determine whether anyone had allowed someone else to use a screwdriver to break into his or her home. Although the prosecutor stated to R.G., “[t]hat would be included,” based on the prosecutor’s statement immediately following that — “I am talking about you were dating, socializing, whoever it was, they had to use it to get in” — it appears either that the prosecutor misspoke when he said “[t]hat would be included,” or that the record contains a typographical error, and the prosecutor actually stated, or meant to state, “[t]hat would [not ] be included.” (R. 79; emphasis added.) Given the specific circumstances of this case — in which someone else, not Bachelder, used a screwdriver to break into the mobile home — R.G.’s response that he had used a screwdriver himself to break into his own home and V.A.’s response that she had allowed her husband to use a screwdriver to break into her home, were not so substantially similar as to support an inference of discrimination. In addition, this Court specifically rejects McCray’s argument that, in asking the question, the State “was interested in people who had let someone that they were dating or living with, but not legally married to, use a screwdriver to gain access to their home.” (McCray’s brief, at 6.) The State specifically mentioned common-law husbands and wives, thus showing that the State was interested not only in dating relationships or living arrangements, but also with marriages.
For the foregoing reasons, this Court finds no error, much less plain error, as to this claim.
B.
McCray also argues that he established a prima facie case of racial discrimination; therefore, the trial court erred in failing to require the State to give its reasons for striking African-Americans pursuant to Batson. McCray also asserts that the court found that he had failed to establish a prima facie case of racial discrimination based on an improper ground.
In support of his arguments, McCray maintains the State’s use of two of its peremptory strikes to remove two of the three remaining African-American prospective jurors, combined with the history of discrimination in the Houston County District Attorney’s Office, establishes a prima facie case of discrimination. In his supplemental brief, McCray also argues that, in addition to its two peremptory strikes against African-American jurors, the State challenged five African-American jurors for cause, thus removing a total of seven of the eight African-American jurors remaining on the venire after the trial court’s excusáis. McCray further asserts that based on the United States *23 Court of Appeals for the Eleventh Circuit’s decision in McGahee v. Alabama Department of Corrections, 560 F.3d 1252 (11th Cir.2009), this Court should consider the State’s challenges for cause as a relevant factor supporting a prima facie case of racial discrimination.[12] McCray finally maintains that the trial court denied his motion solely because one African-American juror was seated on the jury, which he believes is an improper ground for denying a Batson motion.
Initially, this Court notes that although McCray argued at trial that the State had struck two of the three remaining African-Americans on the venire and he excepted to the trial court’s denial of his Batson motion, McCray did not argue at trial that the Houston County District Attorney’s Office had a history of discrimination, nor did he argue that the trial court’s reasoning for denying the motion was flawed; therefore, these arguments are being raised for the first time on appeal and are reviewed for plain error. See Rule 45A, Ala. RApp. P. With respect to McCray’s argument that the trial court denied his Batson motion on an improper ground, this Court observes that the trial court did not deny the motion solely because one African-American sat on the jury. Nor did the trial court, as McCray asserts, “assume[ ] that the presence of one black person on the jury negated the illegal exclusion of other black jurors.” (McCray’s brief, at 23.) Rather, the record reflects that after McCray made his Batson motion, the court specifically questioned him regarding “the sequence” of the State’s strikes against two African-American veniremembers. (R. 213.) Defense counsel indicated that the State had used its fourth and seventh strikes against the two African-Americans, and the trial court noted by name the specific African-American jurors who had been struck by the State. The trial court then denied the Batson motion, stating: “Well, with that sequence of strikes and the fact that there is one black on, I will deny the motion for lack of a prima facie case.” (R. 214.) The trial court clearly did not deny McCray’s motion solely because one African-American was seated on his jury. Instead, it examined the number of strikes against African-Americans, the sequence of the State’s strikes against African-Americans, and the names of the prospective jurors struck, before denying McCray’s Batson motion. Consequently, this Court’s reading of the statement made by the trial court in denying McCray’s Batson motion, in the context of the record, leads it to conclude that in making the statement the trial court was merely trying to mention only a couple of the factors it had considered and that its denial of McCray’s motion was not based on these two factors alone.
Moreover, contrary to McCray’s argument, the number of African-Americans seated on the jury is, in fact, a relevant circumstance to consider in determining whether a prima facie case of racial discrimination has been established. As this Court stated in Mitchell v. State, 579 So.2d 45 (Ala.Crim.App.1991):
“ ‘[A] prima facie case may be made where relevant circumstances indicate an inference of purposeful race discrimination no matter that one or more black persons may remain on the jury.’ United States v. Wilson, 884 F.2d 1121, 1123 (8th Cir.1989). ‘The striking of one ven-ireperson for a racial reason violate[s] the Equal Protection Clause, even when valid reasons for striking some black jurors are shown.’ Williams v. State, *24 548 So.2d 501, 507 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989). ‘Of course, the fact that blacks are ultimately seated on the jury does not necessarily bar a finding of discrimination under Batson [,] see [United States v.] Battle, 836 F.2d [1084] at 1086 [ (8th Cir.1987) ], but the fact may be taken into account in a review of all the circumstances as one that suggests that the government did not seek to rid the jury of persons who shared the defendant’s race.’ United States v. Young-Bey, 893 F.2d 178, 180 (8th Cir.1990).”
579 So.2d at 48 (emphasis added; quoted with approval in Ex parte Thomas, 659 So.2d 3, 7 (Ala.1994)).
With respect to McCray’s argument that he established a prima facie case of racial discrimination, this Court disagrees. Although the State used two peremptory strikes to remove two of the three African-Americans remaining on the veni-re after excusáis and challenges for cause, this fact does not establish a prima facie case of racial discrimination. See Powell v. State, 796 So.2d 404, 431 (Ala.Crim.App.1999) (holding that the State’s use of two of its peremptory strikes to remove two of three African-Americans did not establish a prima facie case of racial discrimination); Powell v. Allen, 602 F.3d 1263, 1270 (11th Cir.2010) (affirming this Court’s holding that no Batson violation occurred when the State used of two of its peremptory strikes to remove two of three African-Americans). Further, to the extent that the Houston County District Attorney’s Office has a history of racial discrimination, that history is attenuated. “The opinions reversing the Houston Circuit Court on Bat-son grounds date from 1991, [almost 20] years ago. The most recent of those opinions was published in 1998, [over 12] years ago.” Floyd, — So.3d at — (opinion on return to remand) (Welch, J., dissenting). See McCray v. State, 738 So.2d 911, 914 (Ala.Crim.App.1998) (reversing the judgment of the Houston County Circuit Court based on a Batson violation). Accordingly, although the Houston County District Attorney’s Office has a history of using its peremptory strikes in an improper manner, this factor, based on the passage of time, does not establish a prima facie case of racial discrimination. Further, the record does not reflect, and McCray does not argue, that the two African-Americans struck by the State shared only the characteristic of race, that anything in the type or manner of the State’s statements or questions during voir dire examination indicated an intent to discriminate against African-American jurors, that there was a lack of meaningful voir dire directed at African-American jurors, or that African-American jurors and Caucasian jurors were treated differently. With nothing more than an attenuated history of improper peremptory challenges, this Court cannot say that the trial court abused its discretion in denying McCray’s Batson motion.
Finally, McCray’s argument that he established a prima facie case of racial discrimination under McGahee, 560 F.3d 1252, is unpersuasive. In McGahee, the defendant made a Batson motion at trial, arguing that the State had discriminated against African-American jurors by using 16 of its 22 peremptory strikes to remove African-American prospective jurors. In response, the State offered general explanations for its strikes, but no specific reasons, and generally denied any alleged discrimination. The State, however, offered to provide specific reasons for each of its strikes if the trial court requested. Instead of requiring the State to provide specific reasons, the trial court denied the motion. At the conclusion of the trial, the State proffered specific reasons for all of *25 its 22 strikes, but the trial court made no ruling on whether those reasons were race-neutral. On appeal, this Court upheld the trial court’s denial of the defendant’s Batson motion, holding that the State had provided at least one race-neutral reason for the six peremptory strikes against African-Americans that had been challenged by the defendant on appeal. See McGahee v. State, 554 So.2d 454 (Ala.Crim.App.), aff'd, 554 So.2d 473 (Ala.1989). After his Rule 32, Ala. R.Crim. P., petition was denied and that denial was affirmed on appeal, see McGahee v. State, 885 So.2d 191 (Ala.Crim.App.2003), the defendant filed a habeas corpus petition in the federal district court. That petition was denied, and the defendant appealed.
The United States Court of Appeals for the Eleventh Circuit reversed the judgment and ordered a new trial, holding that this Court had unreasonably applied the holding in Batson to the facts of the case by failing to consider “all relevant circumstances” in determining that no purposeful discrimination had been established, as required by the holding Batson. First, the Court of Appeals noted that although this Court found at least one race-neutral explanation for each of the six strikes that had been challenged on appeal, this Court ignored the significant fact that the prosecutor had also stated “explicitly racial” reasons for two of those strikes. McGahee, 560 F.3d at 1264. Second, the Court of Appeals further pointed out that this Court had not considered “two additional crucial facts in the Batson analysis,” specifically: (1) the State had removed all of the African-Americans from the venire either through its challenges for cause (the State challenged nine prospective jurors for cause — all nine were African-American — and eight of those challenges were granted by the trial court), or through its peremptory strikes; and (2) the State had indicated that it struck a large number of African-Americans because of “low intelligence” when, in fact, there was no evidence in the record of the intelligence level of any of the jurors. McGahee, 560 F.3d at 1265.[13]
Assuming, without deciding, that the State’s challenges for cause are relevant in determining whether McCray established a prima facie case of racial discrimination, the State’s challenges for cause in this case do not, as McCray argues in his supplemental brief, support an inference of racial discrimination. Compare McGahee, 560 F.3d at 1265 (holding that “the fact that 100% of the African-American potential jurors were ... removed by the prosecution through the challenges for cause and peremptory challenges” is relevant to a Batson determination), with United States v. Elliott, 89 F.3d 1360, 1364-65 (8th Cir.1996) (rejecting an appellant’s argument “that the for-cause strikes in combination with the peremptory strikes resulted in a [Batson violation and holding that] Batson applies only to peremptory strikes ... for which no reasons need be given (absent a Batson challenge) [and thus are inherently] different from challenges for cause, which by definition require a showing of cause”); United States v. Blackman, 66 F.3d 1572, 1575 n. 3 (11th Cir.1995) (recognizing that “no authority suggests Batson extends to the area of challenges for cause”); United States v. Bergodere, 40 *26 F.3d 512, 515-16 (1st Cir.1994) (holding that a defendant attempting to establish “a prima facie case of race-based discrimination ... must demonstrate that the prosecution’s challenge was directed at a member of a cognizable racial group [and] that the ehallenge[s] [were] peremptory rather than for cause ... ”) (internal citations and quotations omitted). The record reflects that the State challenged nine jurors for cause — five of those jurors were African-American. The defense objected to four of those challenges; however, as noted in Parts V and XII of this opinion, those challenges were either properly granted or the reasons for the challenge were race neutral. Just as the race of the jurors challenged for cause may be a “relevant circumstance” to consider in a Batson analysis, so too would be the reasons the party sought to challenge those jurors. Cf. Elliott, 89 F.3d at 1365 (8th Cir.1996) (recognizing that challenges for cause are different because they require a showing of cause). In addition, this Court notes that the State struck the fifth African-American juror challenged for cause because that juror indicated that he could not be fair to the defense, i.e., could not say that McCray was innocent until proven guilty. Thus, this challenge for cause was, in essence, a defense challenge that was simply preempted by the prosecutor, and it, too, was properly granted.
After thoroughly reviewing the record, this Court concludes that, without more, the State’s removal for cause of five African-American prospective jurors and its striking of two of the three remaining African-American prospective jurors, even coupled with the history of the Houston County District Attorney’s Office, is not sufficient under the circumstances in this case to establish a prima facie case of racial discrimination. See, e.g., Sharifi v. State, 993 So.2d 907 (Ala.Crim.App.2008). Therefore, the trial court did not abuse its discretion when it denied McCray’s Batson motion.
II.
McCray next contends that the trial court erred in allowing the prosecutor to elicit or to admit into evidence the following during his cross-examination and recross-examination of McCray: 1) testimony regarding the details of his prior conviction for domestic violence against his ex-wife, Tammy Tidwell; 2) three photographs of the wounds he inflicted on Tid-well during the incident that resulted in his domestic-violence conviction; and 3) testimony regarding an additional uncharged incident involving Tidwell. Specifically, McCray argues that, although his prior conviction could properly be used for impeachment, see Rule 609, Ala. R. Evid., use of a prior conviction for impeachment is limited to the date, name of the crime, and sentence for the conviction, and that the details of the facts underlying that conviction, the photographs of Tidwell’s wounds, and the testimony relating to the uncharged incident were inadmissible as impeachment. McCray further asserts that the trial court erred in allowing the prosecutor to reference the facts underlying his prior conviction during closing argument. Finally, McCray asserts that the trial court’s limiting instruction regarding the prior conviction was untimely and was not sufficient to encompass the details of the prior crime or the photographs that were introduced and, therefore, did not cure the error.
McCray did not object when the prosecutor elicited the details surrounding his prior conviction, did not object when the prosecutor questioned him about the uncharged incident against his ex-wife, did not object to the prosecutor’s closing argument, and did not object to the trial court’s jury instruction. In addition, although *27 McCray objected to the admission into evidence of the photographs of Tidwell’s wounds, he did so on the ground that the photographs were “proof of a collateral matter not relevant to issues in this trial” and that their “prejudicial impact outweighs any probative value.” (R. 955.) McCray never specifically argued that the photographs went beyond the bounds of permissible impeachment, as he now argues on appeal. Therefore, this Court reviews McCray’s arguments for plain error only. See Rule 45A, Ala. R.App. P.
This Court holds that the admission of testimony and evidence relating to the facts underlying McCray’s domestic-violence conviction for assaulting Tidwell, evidence of an uncharged incident involving Tidwell, and argument relating to those facts were inadmissible and improperly admitted at trial. See Frazier v. State, 632 So.2d 1002, 1009 (Ala.Crim.App.1993) (“The presence of a rule that one may cross-examine a witness as to his conviction of a crime involving moral turpitude naturally gives rise to the question of how many details of that crime may the impeaching party ask about and, if necessary, prove by his own witnesses. The law of Alabama, in keeping with the general rule in this country, is that one generally cannot go beyond the name of the crime, the time and place of conviction and the punishment. It would be impermissible to ask about or prove further details such as the name of the victim, whether the victim was adult or child and general aggravating circumstances.” (quoting C. Gamble, McElroy’s Alabama Evidence § 145.01(11) (4th ed.1991))); Ex parte Jackson, 33 So.3d 1279, 1286 (Ala.2009) (holding that to admit evidence of prior bad acts pursuant to Rule 404(b), Ala. R. Evid., the State must demonstrate “that the evidence was reasonably necessary to its case”). However, under the facts of this case, this Court further holds that the erroneous admission of the evidence and the erroneous argument did not rise to the level of plain error.
Under the plain-error standard, the appellant must establish not only that an error occurred, but also that the error aversely affected the outcome of the trial. See Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that the appellant has the burden to establish prejudice relating to an issue being reviewed for plain error); Thomas v. State, 824 So.2d 1, 13 (Ala.Crim.App.1999)(recognizing that to rise to the level of plain error, an error must have affected the outcome of the trial), overruled on other grounds, Ex parte Carter, 889 So.2d 528 (Ala.2004). That is, the appellant must establish that an alleged error, “ ‘ “not only seriously affected] [the appellant’s] ‘substantial rights,’ but ... also ha[d] an unfair prejudicial impact on the jury’s deliberations.” ’ ” Ex parte Brown, 11 So.3d 933, 938 (Ala.2008) (quoting Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002), quoting in turn Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). Only when an error is “so egregious ... that [it] seriously affects the fairness, integrity or public reputation of judicial proceedings,” will reversal be appropriate under the plain-error doctrine. Ex parte Price, 725 So.2d 1063, 1071-72 (Ala.1998) (internal citations and quotations omitted). “The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.” Ex parte Trawick, 698 So.2d at 167.
In addition, Rule 45, Ala. RApp. P., provides:
“No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal *28 of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
“The United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless.” Whitehead v. State, 777 So.2d 781, 847 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000).
“After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was. Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)]; Sattari v. State, 577 So.2d 535 (Ala.Cr.App.1990), cert. denied, 577 So.2d 540 (Ala.1991); [Ala.] R.App. P. 45. Moreover, the harmless error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983); Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Musgrove v. State, 519 So.2d 565 (Ala.Cr.App.), aff'd, 519 So.2d 586 (Ala.1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988). In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict and/or sentence. In order for a nonconstitutional error to be deemed harmless, the appellate court must determine with ‘fair assurance ... that the judgment was not substantially swayed by the error.’ Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). See Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); Vines v. United States, 28 F.3d 1123, 1130 (11th Cir.1994)_ In order for the error to be deemed harmless under Ala. R.App. P. 45, the state must establish that the error did not or probably did not injuriously affect the appellant’s substantial rights.... The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.”
Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998).
After thoroughly reviewing the record, this Court concludes that, under the circumstances in this case, the improper evidence and argument did not injuriously affect McCray’s substantial rights, did not substantially prejudice McCray, and did not have an unfair prejudicial impact on the jury’s deliberations. Initially, this Court notes that the jury was restricted to considering the evidence relating to McCray’s prior conviction for domestic violence for impeachment purposes only. Specifically, at the conclusion of its oral charge, just before it instructed the jury regarding selecting a foreperson, the trial court instructed the jury as follows:
“In a criminal case, the State may attempt to impeach the credibility of a defendant who has testified by providing his former conviction of a crime or crimes involving moral turpitude. Such may be considered by a jury in determining whether to believe the testimony of a defendant, but not for the purpose of determining that the defendant is guilty of the crime for which he is presently charged just because he has committed a previous crime.
*29 “Saying that more clearly, ladies and gentlemen, there has been introduction into evidence or reference to — while Mr. McCray was on the stand of certain convictions. You may not consider those convictions as evidence of guilt in this case, but may consider them for the purpose of his credibility by introducing such evidence the State is attacking or impeaching the credibility of such a witness. And that is the purpose for that.”
(R. 1035.)
Despite McCray’s argument that the instruction was not timely and was not sufficient to include the specific details of his prior conviction, this Court finds that the timing of the instruction was actually beneficial to McCray and that the content of the instruction was sufficient to include the details of his prior conviction and to prevent the jury from using his acts against his ex-wife or the details of that conviction to infer guilt. As noted above, the trial court’s limiting instruction came at the conclusion of its oral charge. Thus, one of the last things the jurors heard, and what presumably would have been resonating in their minds when they were released from the jury box to begin deliberations, was that they could not use the prior conviction as evidence of McCray’s guilt. In addition, as quoted above, the trial court instructed the jury that McCray’s prior convictions [14] could not be used as evidence of his guilt, but could be used only in assessing his credibility as a witness. Although the trial court used the term “conviction” in its instruction, it also used the phrase “evidence and reference to.” Taken as a whole, a reasonable person would have understood that the trial court’s instruction applied not only to McCray’s testimony that he had been convicted of domestic violence, but also to his testimony regarding the facts underlying that conviction; to the uncharged act against his ex-wife, which appears to have been in retaliation for reporting the first act to police; and to the photographs of the wounds he had inflicted on his ex-wife. See, e.g., First Bank of Childersburg v. Florey, 676 So.2d 324, 331 (Ala.Civ.App.1996) (limiting instruction that prior conviction could not be used as substantive evidence cured error in admission of details regarding conviction); See Peralta v. State, 897 So.2d 1161, 1204 (Ala.Crim.App.2003) (“ ‘Jurors are presumed to follow the trial court’s instructions.’ ” (quoting Bryant v. State, 727 So.2d 870, 874-75 (Ala.Crim.App.1998))); Burgess v. State, 827 So.2d 134, 162 (Ala.Crim.App.1998) (“Jurors are presumed to follow the court’s instructions.”).
With the evidence of the prior acts restricted to impeachment, the prosecutor’s improper impeachment of McCray did not affect the outcome of the trial. Although the improperly admitted evidence was used to attack McCray’s credibility, the record shows that his credibility had already been severely damaged before he ever took the stand on his own behalf. In his videotaped statement to police, McCray repeatedly lied about being at Baehelder’s mobile home the night of the murder, about the cut he had on his hand, and about the scratches on his neck. Each time McCray was confronted by the officers during the interview with evidence that he had lied, he changed his story. This happened repeatedly throughout the interview. When McCray testified on his own behalf, he provided yet another story about what had happened, further calling his credibility into question. McCray’s credibility was further attacked by the *30 prosecutor’s proper use of additional prior convictions, and by McCray’s own inconsistencies in his trial testimony. Accordingly, McCray’s credibility was thoroughly undermined without any consideration of the improper impeachment evidence. Finally, although the prosecutor erroneously commented on the improperly admitted evidence during his closing arguments and impermissibly suggested that McCray had a violent character, this Court must consider that McCray was properly questioned about his prior conviction for domestic violence and that it is only the details of that conviction that were improperly admitted. The fact of the conviction alone, especially in light of the relationship between McCray and Bachelder, tended to indicate some propensity on the part of McCray toward violence in the domestic setting and would have, by itself, impaired his credibility. See, e.g., Arebalo v. State, 143 S.W.3d 402, 410 (Tex.Ct.App.2004) (holding harmless erroneous admission of details surrounding defendant’s prior convictions in light of numerous factors, including that the fact of a prior aggravated-assault conviction, alone, “indicated some propensity towards violence and could have weighed against his credibility”). Because the jury was restricted to considering the evidence of McCray’s prior act for impeachment purposes only and because McCray’s credibility had already been thoroughly undermined, if not destroyed, any error in allowing the improper impeachment evidence to be admitted did not rise to the level of plain error. Cf. Ex parte Brown, 11 So.3d at 938-40 (holding that the erroneous admission of evidence did not rise to the level of plain error because the State presented overwhelming evidence of guilt and the inference drawn from the improper evidence was established by other legal evidence).
Finally, the evidence in this case was largely undisputed and overwhelmingly established McCray’s guilt. The State presented an abundance of physical evidence linking McCray to the murder, and McCray admitted during his testimony that he had caused Bachelder’s death. McCray, however, claimed that he had been given permission to enter the mobile home and, thus, had not committed burglary. McCray further claimed that he had been provoked and that Bachelder’s death resulted from heat of passion. The State, on the other hand, presented ironclad evidence refuting McCray’s claims. For instance, the State presented evidence establishing that after McCray had moved out of the mobile home, Bachelder replaced the door knobs, containing the door locks, on both doors of the mobile home and McCray had to use a screwdriver to break in to the trailer, raising the inference that McCray did not have permission to enter Bachelder’s mobile home. The State’s evidence also established that Bachelder was stabbed multiple times, that a dog leash was looped around her neck and used to drag her throughout the mobile home, and that a plastic bag was placed over her head to prevent her from breathing, establishing that any license McCray may have had to be in the trailer would have been revoked, and after it was revoked, he remained there unlawfully. Brown, 11 So.3d at 914 (holding that evidence of a struggle indicates that any license the defendant had had to be in the home was revoked and satisfies the remained-unlawfully element of burglary). Additionally, McCray admitted on cross-examination that he wanted Bachelder to die so that she would not be able to identify him to the police, rebutting his own claim that he killed Bachelder out of heat of passion. See Palmore v. State, 253 Ala. 183, 43 So.2d 399, 401 (1949) (explaining that a person is guilty of murder, as opposed to manslaughter, if that *31 person “is not moved [to kill] by the heat of passion, but by prior malice, hatred, a desire to avenge the wrong done him, or by any other motive ...” (quoting McNeill v. State, 102 Ala. 121, 15 So. 352, 354 (1894))).
Because “the record shows that the evidence of McCray’s guilt is virtually ironclad,” the erroneous admission of evidence and argument relating to his prior acts against his ex-wife “did not affect the outcome of the trial or otherwise prejudice his right to a fair trial.” Chavers v. State, 714 So.2d 341, 344 (Ala.Crim.App.1997). See Ex parte Greathouse, 624 So.2d 208, 211 (Ala.1993) (holding that because the evidence of guilt was “virtually ironclad,” an eiToneous comment on the defendant’s failure to testify “did not affect the outcome of the trial or otherwise prejudice [the defendant’s] right to a fair trial”); Ex parte Price, 725 So.2d at 1072 (“Because the State produced overwhelming evidence, beyond Sheriff Turner’s testimony concerning [Price’s] statement, connecting Price to the crimes, we conclude that the error in allowing Sheriff Turner to testify regarding the statement did not rise to the level of plain error.”); Ex parte T.D.T., 745 So.2d 899, 906 (Ala.1999) (the erroneous admission of an out-of-court statement “was harmless error because, even without it, the record contained] overwhelming evidence of [the defendant’s] guilt”). Therefore, McCray has failed to establish that these errors rise to the level of plain error.
For foregoing reasons, this Court concludes that the errors complained of here do not rise to the level of plain error, but were, at most, harmless. Therefore, McCray is entitled to no relief on these claims.
III.
McCray also contends that the trial court erred in allowing what he claims was inadmissible testimony from Bachelder’s mother, Rolande Dean. He argues that the prosecutor improperly questioned Dean in a leading manner to elicit from her evidence indicating that Bachelder was afraid of McCray when Bachelder’s state of mind was not at issue. McCray also argues that the prosecutor improperly elicited hearsay testimony from Dean that she heard Bachelder tell McCray to leave the mobile home. McCray did not object to any of Dean’s testimony at trial; therefore, this claim is reviewed for plain error only. See Rule 45A, Ala. R.App. P.
During Dean’s testimony, the following occurred, in pertinent part:
“[Prosecutor]: Now, let’s go back to the times before that day when you had seen [Bachelder] with Heath McCray, in other words, at the trailer and in the community — back in, I’d say, July or June, going backwards, did you see how they interacted when they were together around those times?
“[Dean]: Yes.
“[Prosecutor]: Okay. Now, let’s go to that Thursday night before the Wednesday when you found her. When you saw her with Heath McCray, what you observed, was the observation between her and Heath McCray different from what you had seen in the past?
“[Dean]: Yes.
“[Prosecutor]: Did [Bachelder] exhibit any type of — what you saw yourself— fear towards anyone in that trailer?
“[Dean]: Yes.
“[Prosecutor]: Who was it?
“[Dean]: Heath McCray.
“[Prosecutor]: Now, would you tell the ladies and gentlemen of the jury, when you got over there — not what [Ba-chelder] said to you — but were there any discussions about whether Heath *32 McCray was going to continue to live in that trailer then?
“[Dean]: Yes.
“[Prosecutor]: Would you tell the ladies and gentlemen of the jury, did you hear [Bachelder] say anything to Heath McCray personally in the trailer that night?
“[Dean]: Yes.
“[Prosecutor]: What did she say to him?
“[Dean]: He had to leave.
“[Prosecutor]: Would you tell the ladies and gentlemen of the jury, when Heath McCray was told to leave, did he take anything with him or have anything at that time?
“[Dean]: Yes.
“[Prosecutor]: Tell the jury what it was.
“[Dean]: A bag of clothes.
“[Prosecutor]: Now, once again, asking you about [Bachelder] when you observed her and saw her, would you tell the ladies and gentlemen of the jury, was her demeanor and appearance different that night, that Thursday, than in the past when she had been around him?
“[Dean]: Yes.
“[Prosecutor]: Big difference? Little difference? What was it?
“[Dean]: Big difference.”
(R. 266-68.) Later during Dean’s testimony, the following occurred:
“[Prosecutor]: Now, not what she said, but did she indicate — what she showed you — what you watched yourself, did you see any type of fear?
“[Dean]: Yes.”
(R. 283.) In addition, as noted above, Dean testified that after McCray left the mobile home, Bachelder went and purchased new door knobs which she placed on both the front and back doors of the mobile home that night.
To the extent McCray argues that Ba-chelder’s fear of him was irrelevant, this issue is without merit. In Ex parte Martin, 931 So.2d 759 (Ala.2004), the Alabama Supreme Court addressed the admissibility of a murder victim’s state of mind as follows:
“Evidence of the victim’s state of mind or, as here, facts from which one might infer a state of mind, can be relevant where a theory put forth by the defense opens the door to such evidence, thereby making the victim’s state of mind relevant. While other jurisdictions are not entirely consistent,[4] many courts have allowed evidence of a victim’s state of mind only in certain situations. See United States v. Brown, 490 F.2d 758, 767 (D.C.Cir.1973) (recognizing three categories of cases in which a homicide victim’s fear is relevant: 1) where the defendant claims self-defense; 2) where the defendant claims the victim committed suicide; and 3) where the defendant admits some involvement in the crime, but claims that the death was the result of an accident); State v. Revelle, 957 S.W.2d 428, 432 (Mo.Ct.App.1997) (‘Where an accused claims self-defense, the deceased’s state of mind is relevant to the issue of which participant in the killing was the aggressor. Where a defendant concedes his or her presence and involvement in a victim’s death but claims an accident or suicide caused the death, the deceased’s statements as to fear of guns or similar state of mind are relevant to rebut these defenses.’ (citations omitted)); Bray v. Commonwealth, 68 S.W.3d 375, 381-82 (Ky.2002) (‘[W]here a defendant did not claim self-defense, an accidental death, or suicide, such statements [of the victim’s fear of the defendant] usually have “little relevancy except toward providing a strong *33 inference of appellant’s intent, actions or culpability.” ’ (quoting Partin v. Commonwealth, 918 S.W.2d 219, 222 (Ky.1996))); People v. Armendariz, 37 Cal.3d 573, 586, 693 P.2d 243, 251, 209 Cal.Rptr. 664, 672 (1984) (‘This court has repeatedly held that a victim’s out-of-court statements of fear of an accused are admissible ... only when the victim’s conduct in conformity with that fear is in dispute. Absent such dispute, the statements are irrelevant.’); Hatcher v. State, 735 N.E.2d 1155, 1161 (Ind. 2000) (“We have noted three situations where [a statement indicating a homicide victim’s fear] is admissible: (1) to show the intent of the victim to act in a particular way, (2) when the defendant puts the victim’s state of mind in issue, and (3) sometimes to explain physical injuries suffered by the victim.... We decline the State’s invitation to extend this list to include the admissibility of a victim’s state of mind to show the nature of the relationship between the victim and the defendant.’ (emphasis added [in Ex parte Martin ])).
“It is unnecessary for us to decide whether a statement offered not for the truth of the matters asserted, but to suggest a state of mind indicative of fear of a spouse and therefore indicative of a bad marriage, is admissible as nonhear-say under Rule 801(c) or as an exception to the hearsay rule under Rule 803(c). It is unnecessary because Martin suggested during his opening statement that the victim in this case might have committed suicide. Such a theory of defense puts in issue the victim’s state of mind. Statements probative of the victim’s fear of dying or of her will to live are inconsistent with any suicidal tendencies on her part and are therefore relevant. Carey testified that the victim told her that if she did not hear from the victim in ‘three or four days,’ to ‘call [the victim’s] mama and daddy and tell them he did it.’ Such a state of mind, which was consistent with the possibility of her death being occasioned solely by a third party and not by her own hand, was relevant to rebuttal of the defense’s suggestion that the victim may have been suicidal. Therefore, the statement, from which a fact-finder could infer the victim’s state of mind, was relevant to an issue in the case, and the statement was admissible under Rule 401, Ala. R. Evid. Accordingly, the trial court did not err in admitting the evidence over Martin’s hearsay objection.
931 So.2d at 765-67 (some footnotes omitted).
Here, as in Ex parte Martin, Ba-chelder’s state of mind was placed at issue by the defense’s theory of the case. Although the main defense theory of the case was, as noted above, heat of passion, the defense also challenged the burglary element of the capital-murder charge by suggesting that McCray’s entry into the mobile home was normal (because he had previously used a screwdriver to enter the mobile home when he was living there) and that he had a right to be in the mobile home because McCray and Bachelder’s relationship had not ended and she had agreed to meet him that day at the mobile home. Indeed, during opening state *34 ments, defense counsel specifically stated that he expected that the evidence would fail to establish an unlawful entry. Ba-chelder’s fear of McCray just days before her murder rebuts the defense’s suggestion that McCray and Bachelder’s relationship had not ended and tends to indicate that Bachelder would not have invited him to meet her alone in her trailer. Therefore, evidence relating to Bachelder’s state of mind was clearly relevant and admissible under Rule 401, Ala. R. Evid.
Further, to the extent that McCray argues that the trial court erroneously allowed the prosecutor to elicit testimony from Dean regarding Bachelder’s state of mind through leading questions, this argument is likewise without merit. Because evidence of Bachelder’s state of mind was admissible, the fact that Dean’s testimony regarding Bachelder’s fear of McCray was elicited using some arguably leading questions does not constitute error. Rule 611(c), Ala. R. Evid., provides:
“Leading questions should not be used on the direct examination of a witness, except when justice requires that they be allowed. Leading questions are permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.”
However, “Alabama has never enforced an across-the-board ban on leading questions by a prosecutor during direct examination.” Calhoun v. State, 932 So.2d 923, 963 (Ala.Crim.App.2005). “ ‘ “Whether to allow or disallow leading questions is discretionary with the trial court and except for a flagrant violation will there be reversible error.” ’ ” Johnson v. State, [Ms. CR-99-1349, October 2, 2009] — So.3d —, — (Ala.Crim.App.2009) (opinion on remand from the Alabama Supreme Court) (quoting Smith v. State, [Ms. CR-97-1258, December 22, 2000] — So.3d —, — (Ala.Crim.App.2000), aff'd in part, rev’d on other grounds, [Ms. 1010267, March 14, 2003] — So.3d — (Ala.2003), quoting in turn Ruffin v. State, 582 So.2d 1159, 1162 (Ala.Crim.App.1991)). In George v. State, 717 So.2d 827 (Ala.Crim.App.), rev’d on other grounds, 717 So.2d 844 (Ala.1996), this Court addressed a similar issue, stating:
“None of the questions led to the admission of illegal evidence and none prejudiced the appellant. The questions were merely attempts to speed up the direct examination. The trial court is vested with wide discretion in this area ‘because it has been said that there is no form of question which may not be leading and that the trial court should look beyond the form to the substance and effect of the inquiry in the particular circumstances of the case.’ C. Gamble, McElroy’s Alabama Evidence, § 121.05(3) (4th ed.1991). We find no abuse of the trial court’s discretion.”
717 So.2d at 838. None of the prosecutor’s leading questions to Dean elicited any illegal evidence and therefore did not prejudice McCray.
Finally, to the extent McCray argues that Dean’s testimony that she heard Bachelder tell McCray to leave the mobile home was inadmissible hearsay, this Court disagrees. “ ‘Hearsay’ is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c), Ala. R. Evid. Dean’s testimony was not offered to prove the truth of the matter asserted; rather, it was offered to further establish Bachelder’s state of mind, i.e., that she feared McCray and wanted him to stay away. Therefore, this testimony, too, was properly admitted.
*35 For the foregoing reasons, this Court does not find any error, much less plain error, in the admission of Dean’s testimony.
IV.
McCray next contends that there were instances of prosecutorial misconduct throughout his trial. Regarding prosecu-torial-misconduct claims, this Court has explained:
“ ‘The prosecutor’s duty in a criminal prosecution is to seek justice, and although the prosecutor should prosecute with vigor, he or she should not use improper methods calculated to produce a wrongful conviction.’ Smith v. State, [Ms. CR-97-1258, December 22, 2000] — So.3d —, — (Ala.Crim.App. 2000), aff'd in pertinent part, rev’d on other grounds, [Ms. 1010267, March 14, 2003] — So.3d — (Ala.2003). ‘In reviewing allegedly improper prosecuto-rial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.’ Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). ‘ “Prosecutorial misconduct is a basis for reversing an appellant’s conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.” ’ Carroll v. State, 599 So.2d 1253, 1268 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), quoting United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989). The relevant question is whether the prosecutor’s conduct ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).”
Minor v. State, 914 So.2d 372, 415 (Ala.Crim.App.2004). In addition:
“ ‘In judging a prosecutor’s closing argument, the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Bankhead [v. State ], 585 So.2d [97,] 107 [ (Ala.Crim.App.1989),] quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). ‘A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, ‘statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Bankhead, 585 So.2d at 106. ‘Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.’ Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.”
Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). Moreover, “ ‘[t]his court has concluded that the failure to object to im *36 proper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ ” Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991) (quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985)).
With these principles in mind, this Court addresses each of McCray’s arguments in turn.
A.
First, McCray argues that the prosecutor improperly presented evidence and argument at the guilt phase of his trial calculated solely to inflame the jury. Specifically, he argues that: (1) the prosecutor presented improper victim-impact evidence and argument; (2) the prosecutor engaged in an improper demonstration; and (3) the prosecutor improperly called him names during closing arguments.

Victim-Impact Evidence

Initially, McCray contends that during the guilt phase of the trial, the prosecutor improperly presented evidence and argument regarding Bachelder’s two children, improperly presented evidence and argument regarding the pain and blood loss Bachelder endured during the attack, and improperly argued the value of Bachelder’s life. McCray objected during trial to the prosecutor presenting evidence regarding Bachelder’s pain and suffering during the attack. However, he did not object to the evidence and argument regarding Ba-chelder’s two children or to the argument regarding the value of Bachelder’s life;[15] therefore, those claims will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.
During opening statements, the prosecutor stated that “[Bachelder] had two children” (R. 221); that Bachelder and McCray had lived together “with his children and her children” (R. 223) for a period of time before her murder; and that the day of her murder, Bachelder had taken one of her sons to school.[16] During Bachelder’s mother’s testimony, the prosecutor introduced into evidence a photograph of Bachelder with her two children and elicited testimony regarding the names and ages of those children. During closing arguments, the prosecutor stated:
“I asked [McCray], when he testified, what was it like to walk in [Bachelder’s] blood — that you had put a dog chain on her neck. You had put a plastic bag to cut off her air. You had wound it tight. You had stabbed her repeatedly, over and over again on the neck, on both sides. You have cut a carotid artery. You have got cuts and lacerations on her hand. You stabbed her in the breast more than four inches. You stabbed her in the vagina — with the laceration in the vagina while she was lying on that trail *37 er in that floor — in that blood-soaked trailer in the home that she had raised her children in — after that man sitting right over there, Heath Lavon McCray, had pulled down her pants, had taken her underwear and cut her panties.”
(R. 980.) The prosecutor later stated:
“He has got her down on the floor. What is he saying to her? Can you imagine the effects of being stabbed, how she was gurgling, gasping to breathe in her own diaphragm, choking on her own blood as it’s flowing out?
“And she’s looking at the picture— [defense counsel] wants to say there’s his football picture. There’s pictures also in that house of who? Who was important to her? Her children. Her children.”
(R. 994.)
It is well settled that victim-impact statements “ ‘are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible.’ ” Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993) (emphasis in original). However, the admission of victim-impact evidence and argument regarding that evidence does not necessarily require reversal of a conviction, but may be harmless under Rule 45, Ala. R.App. P. As the Alabama Supreme Court explained in addressing a similar issue in Ex parte Rieber, 663 So.2d 999 (Ala.1995):
“We agree with Rieber that Mr. Craig’s testimony concerning Ms. Craig’s children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was inadmissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether Rieber had robbed and killed Ms. Craig. However, in Ex parte Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life-imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See, also, Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, [512] U.S. [1213], 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Ex parte Parker, 610 So.2d 1181 (Ala.1992), cert. denied, [509] U.S. [929], 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993); Lawhorn v. State, [581 So.2d 1159 (Ala.Crim.App.1990), affd, 581 So.2d 1179 (Ala.1991) ]; Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); and Ex parte Whisenhant, [555 So.2d 235 (Ala.1989) ], applying a harmless error analysis in death penalty cases. Our review of the record indicates that Rieber’s attorneys did not object to Mr. Craig’s brief references to Ms. Craig’s children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether Rieber had robbed and killed Ms. Craig. The jury was instructed that it could not find Rieber guilty unless the prosecutor had established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its verdict. We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital *38 murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of Mr. Craig’s testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected — that Ms. Craig was not a ‘human island,’ but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991)).”
663 So.2d at 1005-06.
Hei'e, as in Ex parte Rieber, the testimony and argument regarding Ba-chelder’s children were irrelevant to any issue in the case and inadmissible. However, after reviewing the record as a whole, this Court finds no indication that the testimony or argument affected the outcome of the trial or that it otherwise prejudiced McCray’s substantial rights. Therefore, the error in allowing this testimony and argument was harmless.
Next, during Dr. Boudreau’s testimony, the prosecutor elicited evidence regarding each wound suffered by Bachelder, the amount of blood loss that would likely have been associated with that wound, and whether the specific wound would have caused pain to Bachelder. During closing arguments, the prosecutor referred to the pain Bachelder must have suffered during the attack and described McCray’s actions as slaughtering, butchering, and torturing. As noted above, the prosecutor also asked the jury: “Can you imagine the effects of being stabbed, how she was gurgling, gasping to breathe in her own diaphragm, choking on her own blood as it’s flowing out?” (R. 994.) The prosecutor later asked the jury: “What’s it like to feel that knife — six, seven, eight inches, five inches of that steel going into your flesh, going through your organ, in other words, in your breast, going through your muscles being twisted, being stabbed and you are going to be moving around?” (R. 1000.) During rebuttal closing arguments, the prosecutor asked similar questions of the jury.
McCray argues that this evidence and argument were irrelevant, prejudicial, and inadmissible at the guilt phase of his trial because they were relevant only to the penalty-phase issue of whether the murder was especially heinous, atrocious, or cruel as compared to other capital offenses. However, McCray has cited no authority, and this Court has not found any, that prohibits the introduction of evidence and argument to the jury regarding the circumstances surrounding a murder. The pain and suffering of the victim is a circumstance surrounding the murder — a circumstance that is relevant and admissible during the guilt phase of a capital trial. See, e.g., Smith v. State, 795 So.2d 788, 812 (Ala.Crim.App.2000) (no error in trial court questioning witness regarding the number of wounds on the murder victim’s body during guilt phase of capital-murder trial despite appellant’s argument that the number of wounds was relevant only to the *39 penalty-phase issue of whether the murder was especially heinous, atrocious, or cruel).
In addition, as part of his defense, McCray asserted that he did not commit a burglary because he had Bachelder’s permission to enter her mobile home and did not enter or remain unlawfully in her dwelling, as required to establish the burglary that elevated the murder to a capital offense. However, as the Alabama Supreme Court explained in Davis v. State, 787 So.2d 480 (Ala.1999):
“The common law defined the crime of burglary far more narrowly than its statutory successor does. Common-law burglary required a breaking and entering of the dwelling of another in the nighttime with the intent to commit a felony. Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law § 8.13 (1986). When Alabama adopted its current burglary statute, as part of the Alabama Criminal Code, by Act No. 607, Reg. Session, Ala. Acts 1977, the legislature expanded the crime of burglary beyond its common-law boundaries, by eliminating most of the common-law requirements. The requirement of a ‘breaking’ was one requirement deleted. Perry v. State, 407 So.2d 183 (Ala.Crim.App.1981). The State is no longer required to prove that the defendant broke and entered the premises. Instead, the strictures of that element have been replaced with the general requirement of a trespass on premises through an unlawful entry or an unlawful remaining.
[[Image here]]
“While the State was not required to prove ‘breaking and entering,’ it was required to prove that Davis entered or remained ‘unlawfully’ in Harrington’s home with the intent to commit a crime. The ‘unlawful remaining’ prong of Alabama’s burglary statute ‘cover[s] cases where a person enters with license or privilege but remains after termination of such license or privilege.’ Ala.Code 1975, § 13A-7-1 Commentary.
[[Image here]]
“Evidence of a straggle that gives rise to circumstantial evidence of revocation of a license or privilege can be used, to show an unlawful remaining, a separate prong of the offense of burglary upon which a conviction can be based....
“We reiterate that the evidence of a commission of a crime, standing alone, is inadequate to support the finding of an unlawful remaining, but evidence of a struggle can supply the necessary evidence of an unlawful remaining. In homicide cases, the mere fact of the victim’s death cannot be equated with a struggle. For example, evidence of a privileged entry followed by death from an injury inflicted by surprise or stealth and causing instantaneous death would not constitute circumstantial evidence of an unlawful remaining. Likewise, a privileged entry followed by death from an injury inflicted by a delayed mechanism, such as poison, would be equally deficient.
“The evidence was sufficient for the jury to find that Davis killed Harrington during a burglary. The evidence of a struggle giving rise to the inference of an unlawful remaining is supplied by Davis’s choice to kill by a less-than-instantaneous technique of strangulation and by his use of three nonfatal stab wounds to the victim’s lower back. Based on the circumstances suggested by the evidence, the jury reasonably could have found that Davis, from the point at which he began committing his criminal acts, ‘remain[ed] unlawfully’ in Harrington’s home with the intent to commit a crime.”
*40 737 So.2d at 482-84 (emphasis added). See also Brown, 11 So.3d 866, 914 (Ala.Crim.App.2007) (same). It was necessary for the State to rebut McCray’s assertion that he did not enter or remain unlawfully in Bachelder’s mobile home. The victim’s wounds, the amount of blood lost, and her pain were direct evidence of a lengthy struggle that circumstantially established that, even if McCray had permission to enter the mobile home, his license or privilege to be in the mobile home was revoked when he brutally attacked Bachelder and that after the revocation, he unlawfully remained in the mobile home. Therefore, this Court finds no error in the admission of this testimony or in the prosecutor’s argument in this regard.
Finally, at the conclusion of his closing arguments, the prosecutor stated:
“I can tell you what she did. She fought and she kicked him, she tried to do all she could. She stuck her hands up and took that hand and almost split it. She had no chance.
“And they want to say heat of passion, he lost all control. He didn’t lose no control. He planned it out. He executed it. He did it. And the only time Heath McCray ever decided to tell the truth in this case is in front of you, 12 good people, because he is facing what? Capital murder conviction. They want you to find him guilty of manslaughter. Find him not guilty if you think that’s all her life was worth, that that’s all her life was worth. Woman slaughterer.”
(R. 1001; emphasis indicates portion complained of by McCray.) Read in context, this Court finds this comment was nothing more than a proper plea for justice. See, e.g., Minor, 914 So.2d at 421 (urging jury not to “let him get away with” murder “for the sake” of the victim’s memory was nothing more than an appeal for justice). “ ‘There is no impropriety in a prosecutor’s appeal to the jury for justice and to properly perform its duty.’ ” Freeman v. State, 776 So.2d 160, 186 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000) (quoting Price v. State, 725 So.2d 1003, 1033 (Ala.Crim.App.1997), aff'd 725 So.2d 1063 (Ala.1998)). However, even assuming that this comment was improper,[17] this Court has thoroughly reviewed the record and concludes that this single comment did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. Therefore, this Court finds no error, much less plain error, in this comment by the prosecutor.

Demonstration

McCray also contends that the prosecutor engaged in an improper demonstration while cross-examining him by requesting that McCray hold the murder weapon (the butcher knife) and the dog leash that had been found around Bachelder’s neck and show the jury how he got the dog leash around her neck while holding the knife. McCray argues that this demonstration was highly prejudicial because the jury had already seen the photographs of the crime scene and the wounds to Bachelder’s body and seeing him in the courtroom holding the butcher knife and the dog leash “only intensified the already inflamed passions and prejudices of the jury.” (McCray’s brief, at 50-51.) McCray did not object to this allegedly improper demonstration; therefore, this Court reviews this claim under the plain-error standard. See Rule 45A, Ala. R.App. P.
*41 The record reflects the following during cross-examination of McCray:
“[Prosecutor]: What color was the dog leash you put on [Bachelder’s] neck?
“[McCray]: I want to say it was black.
“[Prosecutor]: Is this the dog leash?
“[McCray]: No, sir.
“[Prosecutor]: This is the dog leash. Right?
“[McCray]: Uh-huh.
“[Prosecutor]: This is State’s Exhibit No. 106. Can you hold it?
“[McCray]: Uh-huh.
“[Prosecutor]: Kind of open it up and take it and kind of show me how you got that dog leash around the woman that you loved to F-ing death[18] — how you got it around her neck.
“[McCray]: Well, we was tussling at the time. And I don’t remember how I did it, but somehow I got it through the loop.
“[Prosecutor]: Let me ask you this— somehow you did it. What part of your body told your hands how to get that around her neck? It’s your brain. Right?
“[McCray]: I assume so.
“[Prosecutor]: Take State’s 16 [the butcher knife] and hold it in your hand, please, sir. Pick it up and hold it. Now, pick up the dog chain — together. How did you get the dog chain on her while you had the knife and she was running, trying to get away? Show me with your hands.
“[McCray]: I didn’t have the knife.
“[Prosecutor]: Okay. Who had the knife?
“[McCray]: It was laying on the couch.
“[Prosecutor]: Is that after you had stabbed her?
“[McCray]: I can’t recall.”
(R. 924-26.)
Regarding experiment or demonstrations in court, this Court, has held:
“The rule on the admissibility of experiments in open court is stated in Shows v. Brunson, 229 Ala. 682, 685,159 So. 248, 251 (1935).
“ ‘Experiments or tests of this character in open court are usually within the discretion of the trial judge, guided by a sound judgment as to whether the result will be sufficiently relevant and material to warrant such procedure. 22 C.J. p. 790, s 899.
“‘Similarity of conditions, and a test that will go to the substantial question in hand, should appear.’
“See also Hawkins v. State, 53 Ala.App. 89, 93, 297 So.2d 813 (1974). Both the scope and extent of the experiment, if allowed, rest within the sound discretion of the trial judge. The exercise of that discretion will not be reversed on appeal unless it has been clearly and grossly abused. Campbell v. State, 55 Ala. 80 (1876); C. Gamble, McElroy’s Alabama Evidence, § 81.02(1) (3rd ed.1977).
“While the conditions of the experiment and of the occurrence in issue should be substantially similar, they need not be identical. McElroy’s 81.01(4).
“ ‘A reasonable or substantial similarity suffices and only where the conditions are dissimilar in an essential particular should the evidence of an experiment be rejected. If we have a case where the conditions are not *42 identical, then the dissimilarity goes to the weight of the evidence of the experiment but not to its admissibility-’
“See also Eddy v. State, 352 So.2d 1161 (Ala.Cr.App.1977).”
Ivey v. State, 369 So.2d 1276, 1278-79 (Ala.Crim.App.1979). In Gobble v. State, [Ms. CR-05-0225, February 5, 2010] - So.3d -(Ala.Crim.App.2010), this Court further explained the admissibility of experiments or demonstrations in the courtroom as follows:
“‘Demonstrations and experiments are permitted or prohibited in the trial court’s discretion. Thus, Alabama appellate courts have affirmed trial court decisions permitting an experiment on cross-examination to test the defendant’s ability to calculate interest as he said he had; a demonstration using a mannequin and the defendant herself to discredit her assertion that the prosecuted homicide happened accidentally; a demonstration of the defendant’s version of how a fight occurred, the solicitor playing the deceased and the defendant playing himself; a demonstration wherein the defendant made prints of his bare feet in the sawdust on the courtroom floor; a demonstration by the defendant of the extent to which his injuries had impaired his ability to walk; and a demonstration between a brain damaged child and a special education therapist calculated to show the child’s physical and mental abilities.’
“William A. Schroeder and Jerome A. Hoffman, Alabama Evidence § 12:25 (3d ed.2006) (footnotes omitted).
“In Ivey v. State, 369 So.2d 1276 (Ala.Crim.App.1979), this Court considered whether the circuit court erred in allowing the prosecutor to cross-examine the defendant using a full-size[d] mannequin to test the credibility of the defendant’s version of the events. We stated:
[[Image here]]
“ ‘In Lumpkin v. State, 19 Ala.App. 272, 97 So. 171 (1923), it was held not error to require, upon cross examination, a defendant in a homicide case, who had become a witness in his own behalf, to illustrate before the jury how the fatal fight occurred by showing the motions and actions of the parties to the encounter, with the State’s attorney taking the part of the deceased. Also in [Coats ] v. State, 253 Ala. 290, 45 So.2d 35 (1950), it was held not error to permit the appellant, at the request of the State during its cross examination and over the objection of defense counsel, to leave the ■witness stand and sit in a chair, in view of the jury, so as to better demonstrate the manner in which the appellant contended he was holding the gun at the time of its discharge.
“ ‘The scope and extent of cross examination rest in the sound discretion of the trial court, Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969), as do the scope and extent of experiments and demonstrations. Campbell [v. State, 55 Ala. 80 (1876) ]; [C. Gamble] McElroy[’s Alabama Evidence ], §§ 81.01(3), 81.02(1) [ (3rd ed. 1977) ]. As a general rule experiments and demonstrations should be permitted to be made in the courtroom in the jury’s presence where it reasonably appears that the experiment will aid the jury in ascertaining the truth, where there exists a substantial similarity of conditions and where the experiment will not unfairly prejudice the defendant.’
“369 So.2d at 1279-80. See also Annot., Propriety of Requiring Criminal Defen *43 dant to Exhibit Self, or Perform Physical Act, or Participate in Demonstration, During Trial and in Presence of Jury, 3 A.L.R.4th 874 (1981).”
— So.3d at —. Finally, as this Court explained in Minor v. State, 780 So.2d 707 (Ala.Crim.App.1999), rev’d on other grounds, 780 So.2d 796 (Ala.2000):
“[B]efore the demonstration, the trial court should determine if the prejudicial effect of the demonstration substantially outweighs its probative value. Even if the trial court finds the demonstration to be relevant and helpful to the jury, the trial court may still exclude it if the probative value is substantially outweighed by the danger of unfair prejudice. See Rule 403, Ala. R. Evid.; [Charles W. Gamble,] McElroyPs] Alabama Evidence § 81.02 [ (5th ed.1996) ]. ‘The power to make this determination is vested in the trial court.’ Hayes v. State, 717 So.2d [30,] 37 [ (Ala.Crim.App.1997) ].”
780 So.2d at 763. See also Mitchell v. State, 84 So.3d 968 (Ala.Crim.App.2010).
Here, the trial court properly allowed the prosecutor to ask McCray to hold the murder weapon and the dog leash. It was relevant and admissible to test McCray’s version of events,[19] to aid the jury in ascertaining the truth about the murder, and to rebut McCray’s claim of heat of passion and his repeated allegations on direct examination that he did not remember all that had happened. Moreover, after thoroughly reviewing the record, this Court finds that the prejudicial effect of the demonstration did not outweigh its probative value. Therefore, this Court finds no error, much less plain error, as to this claim.

Name-Calling

McCray further contends that the prosecutor improperly called him names during closing arguments. Specifically, McCray argues that the prosecutor improperly referred to him as a “psychopath,” as a “woman slaughterer,” as “evil,” and as “death” throughout his closing arguments to the jury. The record reflects that McCray made no objections to the prosecutor’s closing arguments during the guilt phase of the trial. Therefore, this Court reviews this claim for plain error only. See Rule 45A, Ala. R.App. P.
Contrary to McCray’s contention, “ ‘ “the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case.” ’ ” Minor, 914 So.2d at 420 (quoting Henderson v. State, 584 So.2d 841, 857 (Ala.Crim.App.1988), quoting in turn Nicks v. State, 521 So.2d 1018, 1023 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.1988)). “This Court has repeatedly held that the prosecutor may refer to an accused in unfavorable terms, so long as the evidence warrants the use of such terms.” McNair v. State, 653 So.2d 320, 341 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) (references to the accused as “ ‘death,’ ” “ ‘death and destruction,’ ” and a “ ‘brute’ ” were supported by the evidence and were not improper). See also Maples v. State, 758 So.2d 1, 58 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala.1999) (prosecutor’s comment that the defendant *44 “ ‘is a murderer; a capital murderer’ ” was not improper); Melson v. State, 775 So.2d 857, 885-889 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000) (prosecutor’s references to the accused as a “ ‘cold-blooded murderer’ ” with “ ‘no remorse’ ” and as an “ ‘animal’ ” were not improper); Thomas v. State, 766 So.2d 860, 933-34 (Ala.Crim.App.1998), aff'd, 766 So.2d 975 (Ala.2000) (prosecutor’s references to defendant as a “‘street punk,’” “‘criminal,’” “‘thug,’” “ ‘murderer,’ ” and “ ‘manipulator’ ” were not improper); Pierce v. State, 576 So.2d 236, 249 (Ala.Crim.App.1990) (prosecutor’s characterization of the accused as an “ ‘evil person’ ” was not improper); Kinard v. State, 495 So.2d 705, 711 (Ala.Crim.App.1986) (prosecutor’s reference to defendant as “ ‘an unmitigated liar and murderer’ ” was not improper); and Handley v. State, 214 Ala. 172, 175, 106 So. 692, 695 (1925) (argument that “ ‘[s]he is a murderer; she is a murderer. She is not some one who has committed some of the lower offenses of homicide’ did not transcend the bounds of legitimate argument”).
The prosecutor’s comments here were supported by the evidence, as set out above, and were not improper. Nor did the comments unnecessarily inflame the passion of the jury. Instead, the comments were presumably valued by the jury at their true worth — as uttered in the heat of debate. McGowan v. State, 990 So.2d 931, 974 (Ala.Crim.App.2003) (recognizing that a prosecutor’s argument is “viewed as having been made in the heat of the debate, and such a remark is usually valued by the jury at its true worth and not expected to become a factor in the formulation of the verdict”). Therefore, this Court finds no error, much less plain error, as to this claim.
B.
Second, McCray argues that the prosecutor improperly and “repeatedly misled the jury regarding the law” during both the guilt phase and the penalty phase of his trial. (McCray’s brief, at 53.) Specifically, McCray argues that: (1) the prosecutor improperly shifted the burden of proof to him during the guilt phase of the trial by stating the he could have had the socks found at the scene tested for DNA; and (2) the prosecutor improperly misrepresented the law regarding the aggravating and mitigating circumstances during his closing arguments at the penalty phase of the trial.

Burden of Proof

Initially, McCray contends that the prosecutor improperly shifted the burden of proof to him during closing arguments at the guilt phase of the trial by arguing that he should have had the pair of socks that were found at the scene tested for DNA. McCray did not object to the prosecutor’s comment; therefore, this Court reviews this issue for plain error only. See Rule 45A, Ala. R.App. P.
As noted above, the State’s theory of the case was that McCray planned and intentionally murdered Bachelder as revenge for her ending their relationship. At the scene, law-enforcement officers found a pair of socks lying on the living-room floor. The State theorized that McCray had used the socks to cover his hands during the murder to avoid leaving fingerprints at the scene. During cross-examination of two of the State’s witnesses — the DNA expert, Kristen Maturi, and Cpl. Etress — the defense elicited testimony that the socks found on the living-room floor had not been tested for DNA. During closing arguments, defense counsel stated:
“At one point, I thought we were going to hear some sort of definitive proof that the socks — not the ones worn by [Bachelder], but the other pair, were going to be used as mittens, and yet that *45 never materialized. They were not identified as being particularly significant when they went into the crime lab. You heard testimony about that and the lack of any kind of DNA testimony. Of course, you know from the — from the testimony you’ve heard, that that would be [of] significance with a bleeding wound on his right hand in terms of what DNA might have disclosed about that.
“It’s not our job to show that something like that was not used. It’s not our job to prove a negative in that regard. If the State relies on that, it’s up to them to present and argue the proof.”
(R. 1007-08.) During rebuttal closing arguments, the prosecutor stated, in relevant part:
“Well, good people, let’s talk about those socks. I submit [defense counsel’s] mistaken. These are the photographs of what he did to [Baehelder], how he butchered her. He had those socks on. I’ll tell you why. We didn’t find any fingerprints in that whole house except on one light bulb. So that’s another thing to show you he planned this out....
[[Image here]]
“He took that deadly weapon, and he terrorized her. She went through pure hell. What was it like? And I’ll sit down with this. What was it like all those times that she was sliced, diced, cut, stabbed, stabbed in the aorta, stabbed in the breast, stabbed in the hand? It goes through her arm, all the way through the other side. Look at her right down here — and he wants some consideration because he said the State didn’t prove it? He could have tested the dang socks if he wanted them tested, but he didn’t test them, either.”
(R. 1014-19; emphasis indicates portion complained of by McCray.)
Assuming, without deciding, that the prosecutor’s comment was improper, it does not rise to the level of plain error and thus does not warrant reversal. See Rule 45A, Ala. RApp. P. “ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” ’ ” Ex parte Brown, 11 So.3d at 938 (quoting Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002), quoting in turn, Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). This isolated remark was uttered in the heat of the debate and was in response to defense counsel’s criticism of the State’s case for failing to have the socks tested for DNA. See Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989) (holding “that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict”); Brown, 11 So.3d at 909 (same). Further, the prosecutor’s remark did not suggest that McCray was required to have the socks tested himself. Instead, the prosecutor appears to have been arguing that testing of the socks was unnecessary and that, if defense counsel disagreed, “[h]e could have tested the dang socks if he wanted them tested.” (R. 1019; emphasis added). More importantly, the trial court thoroughly instructed the jury that McCray was presumed innocent and that the burden of proving McCray’s guilt beyond a reasonable doubt was on the State. (R. 979; 1022-23.) See Peralta, 897 So.2d at 1204 (“ ‘Jurors are presumed to follow the trial court’s instructions.’ ” (quoting Bryant, 727 So.2d at 874-75)); Burgess, 827 So.2d at 162 (“Jurors are presumed to follow the court’s instructions.”). Thus, any error or confusion created by the pros *46 ecutor’s isolated, inartful remark was cured by the trial court through instructions. See Minor, 914 So.2d at 423 (holding that “any possible confusion about the burden of proof engendered by the prosecutor’s comment was cured by the trial court’s prompt instructions to the jury that the burden of proof was on the State and that statements of counsel are not evidence”); Melson, 775 So.2d at 884-85 (holding that even if the prosecutor’s comment that “[i]t is very difficult to prove someone is innocent when they are not” was improper, the comment did not rise to the level of plain error because it was “brief and isolated” and “the trial court[ ] property] instruction[ed] ... the jury concerning the burden of proof’).
Furthermore, McCray’s use of the socks to prevent leaving fingerprints was only a part of the State’s case establishing that he planned the attack and rebutting his heat-of-passion defense. In addition to the socks, the State also presented evidence indicating that McCray had removed the battery from the cordless telephone so Ba-chelder could not call for help. The State presented evidence indicating the McCray disabled all the lights in the trailer to allow him to attack Bachelder in the dark. Finally, and most damning, during cross-examination, McCray admitted that he wanted Bachelder to die to prevent her from identifying him as her attacker. Consequently, the State presented overwhelming evidence, including McCray’s admission, rebutting his heat-of-passion defense. Ex parte Brown, 11 So.3d at 938-40 (holding that the erroneous admission of evidence did not rise to the level of plain error because the State presented overwhelming evidence of guilt and the inference drawn from the improper evidence was established by other legal evidence). Therefore, any error in the prosecutor’s comment had no effect on the outcome of the trial and did not rise to the level of plain error.

Aggravating and Mitigating Circumstances

McCray also argues that the prosecutor’s closing arguments at the penalty phase of the trial improperly misled the jury as to the law regarding aggravating and mitigating circumstances. Specifically, he argues that references to him as “evil” and “wicked” improperly misled the jury regarding the aggravating circumstance that the murder was especially heinous, atrocious, or cruel compared to other capital offenses. Specifically, he argues that those references improperly suggested that the jury could find the especially heinous, atrocious, or cruel aggravating circumstance to exist if it found that McCray was “evil” and “wicked” without determining whether the crime itself was especially heinous, atrocious, or cruel as compared to other capital offenses. He further argues that the prosecutor improperly suggested that the jury was not required to consider the mitigating circumstances offered by him but should do so only because the prosecutor asked the jury to, and that the prosecutor improperly injected his own personal opinion that the mitigating circumstances offered by McCray “did not mean ‘squat’ ” (McCray’s brief, at 58), thus increasing the likelihood that the jury did not properly consider the mitigating circumstances he offered. McCray did not object to the prosecutor’s closing arguments at the penalty phase of the trial; therefore, this Court reviews these claims for plain error only. See Rule 45A, Ala. R.App. P.
In context, the prosecutor argued the following to the jury at the penalty phase:
“Three aggravating circumstances, we submit, we have proved to you beyond a reasonable doubt 100 percent beyond all doubt....
*47 [[Image here]]
“Now, the third aggravating circumstance, I submit we have proved to you beyond all doubt, heinous, atrocious and cruel. The judge will testify [sic] and tell you what those definitions are. Once again, I don’t want to be repetitious. We have adopted all the testimony [from the guilt phase of the trial]. You heard it. There is 12 of you. Two times 12 is 24 ears, 24 eyes, 12 hearts, souls and minds. You have heard the testimony.
“This is what he did to [Bachelder], He took that butcher knife. He tortured her. He cut her. He sliced her. He diced her. He stabbed her. He took that dog chain, put it around her throat. He put that bag over her face. He drug her.
“He got on the stand, and I asked him, tell the jury, Heath, who killed her? And he said he did.
“I said, let me ask his sister, did he tell you he killed her? Once again, they put on witnesses at the penalty phase. Oh, no, he didn’t tell me he killed her. He didn’t tell me. But he is a good person.
“He is not a good person. He is an evil, wicked, psychopath. I’ll submit to you, he inflicted such death and destruction and damage and torture on poor [Bachelder]. Remember the testimony forever.
“I asked him, what was it like when you took this butcher knife and you had it and you stabbed her and you cut her? How did she react? What did she do? She cried. -She begged for mercy. She was suffering, asking him to stop. He kept [whaling] away, stabbing her and cutting her. And this is what he did. Remember the picture. This is what he did. Took off her clothes in the position he left her, pulled-down her pants, cut her underwear, pulled up her bra. This is how he left her with that dog chain.
. “And he says that she was stronger than him. And this is the blood patterns. You have seen them. I know you have. But I have to stand up here and show you and prove it was heinous, atrocious and cruel. And what those definitions mean, that he inflicted pain — he is evil and wicked. He did it for sheer enjoyment of the suffering of another human being, conscienceless, pitiless acts that he did to poor [Ba-chelder].
“And look at the blood here, once again, where after he had stabbed her and cut her and he is dragging her around, the circles in there. That is his own blood. Remember the question: Heath, what was it like to walk in her blood with your bare feet? He took off his pants, got down to his boxer shorts. He got that butcher knife. What was it like for poor [Bachelder] — physically, mentally, emotionally, what’s it like to feel pain?
[[Image here]]
“They have presented some mitigating circumstances to you.
[[Image here]]
“But he told his own family, I didn’t do this. What you going to do to me, Frank? I want to go home and see my children, the children he loved and the people he cared about. Look at the witnesses he put on mitigation. Who were they? His own mother....
[[Image here]]
“Heath McCray — his sister got up there and said, oh, he took care of the children. He came to' visit. He was with them every day he got off work.
[[Image here]]
“Then they put on another woman who says, well, I had medical problems, *48 and he helped take care of me. What was he doing over there on the job time? What was he doing to her? Use your own imagination.
[[Image here]]
“He’s slick. He’s smart. He’s intelligent. He knows how to use people, to cover things up, how to lie to protect his own self. That’s what evil, wicked Heath McCray is.
“Look at the evidence that this calls out. What was it like for [Bachelder] during that time? Was he that good person when he was slaughtering her? When she was begging for mercy, what was he doing to her to make sure she couldn’t identify him? ...
[[Image here]]
“And I asked him, admit in the courtroom today in front of your own family members that you killed her, you butchered her and you did it. What did he say? I did it. There’s no doubt. Heinous, atrocious and cruel.
“What is pain? What’s it like? Use your own common sense what it’s like, the pain she suffered and the pain he has done, physically, emotionally — physically, what it was like for [Bachelder] as she laid in her own trailer and as the seconds turned into minutes, minutes turned into a longer time, she was lying there, and her poor little heart was just a pumping, pumping, pumping, trying to get air and oxygen into the brain where he had done all these things.
[[Image here]]
“I have the burden of proof. That’s why I get to go first.
“They are going to talk real quickly about some mitigating circumstances. He was good to the siblings. He was good to the children. He helped take care of people. He just used people is all he did and has done all his life.
[[Image here]]

“He’s an evil and wicked man. There ain’t nothing good about him in any manner or fashion in any way.

“Once again, now, he still has some excuses, excuses to say, well, these are things — mitigating circumstances. You should consider them. I want you to consider them. But they don’t mean squat. This — this—this was life. And now I submit to you, they want you to spare his life.
“Don’t let it happen. Don’t do it. Don’t make the mistake. Thank you.”
(R. 1144-55; emphasis indicates portions complained of by McCray.)
Taken out of context, the above quoted emphasized portions of the prosecutor’s closing arguments regarding McCray being “evil” and “wicked” may appear to be improperly suggesting to the jury that McCray, and not the crime he committed, is the focus in determining whether the crime was especially heinous, atrocious, or cruel as compared to other capital offenses. However, when read in context of the prosecutor’s complete closing argument (much of which is quoted above), it is clear that the prosecutor’s argument regarding this aggravating circumstance did not improperly focus on McCray’s character, but focused on the character of the murder itself — including the length of the assault, the wounds inflicted, and the pain and suffering Bachelder endured. In addition, the trial court properly and thoroughly instructed the jury on the law regarding the heinous, atrocious, or cruel aggravating circumstance.
Moreover, the prosecutor’s argument that the jury should consider the mitigating circumstances offered by McCray was a correct statement of the law, and did not impermissibly suggest that the jury could choose to not consider *49 the mitigating circumstances offered. “The capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding his character or record and any of the circumstances of the offense, and consideration of such evidence is a constitutionally indispensible part of the process of inflicting the penalty of death.” Haney v. State, 603 So.2d 368, 389 (Ala.Crim.App.), aff'd, 603 So.2d 412 (Ala.1991). See also § 13A-5-52, Ala.Code 1975 (“In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.”).
Further, when read in context, the prosecutor’s argument that the mitigating circumstances offered by McCray “don’t mean squat” was clearly nothing more than an argument that the three aggravating circumstances offered by the prosecution far outweighed the mitigating circumstances offered by the defense and that McCray should be sentenced to death. This, too, was a proper argument. “ ‘[I]m-peachment of the evidence of a defendant and the matter of impairment of its weight are properly matters for argument of counsel-’” Burgess, 827 So.2d at 162 (Ala.Crim.App.1998) (quoting Mosley v. State, 241 Ala. 132, 136, 1 So.2d 593, 595 (1941)). “Further, ‘[a] prosecutor may present an argument to the jury regarding the appropriate weight to afford the mitigating factors offered by the defendant.’ ” Vanpelt v. State, 74 So.3d 32, 90 (Aa.Crim.App.2009) (quoting Malicoat v. Mullin, 426 F.3d 1241, 1257 (10th Cir.2005)). That is, “the prosecutor, as an advocate, may argue to the jury that it should give the defendant’s mitigating evidence little or no weight.” Mitchell, 84 So.3d at 1001. See also State v. Storey, 40 S.W.3d 898, 910-11 (Mo.2001) (holding that no error resulted from the prosecutor’s characterization of mitigation as excuses because the “State is not required to agree with the defendant that the evidence offered during the penalty phase is sufficiently mitigating to preclude imposition of the death sentenced and] the State is free to argue that the evidence is not mitigating at all”).
Therefore, this Court finds no error, much less plain error, as to these claims.
C.
Third, McCray argues that the prosecutor improperly argued facts not in evidence when he argued in the first person, pretending to be Bachelder, at the penalty phase of the trial. McCray specifically argues that the prosecutor’s statements that Bachelder had a “tough life” and that she was “tired” when she came home from work the night she was murdered were unsupported by the evidence. As noted above, McCray did not object to the prosecutor’s closing argument at the penalty phase of the trial; therefore, this Court reviews this claim for plain error only. See Rule 45A, Ala. RApp. P.
In context, the prosecutor stated the following during his rebuttal closing argument:
“And on that tape [of McCray’s interview with police], lying, lying, lying. [Defense counsel] said, well, there’s one thing of truth on that tape where [Detective Frank] Meredith says he had known Heath McCray. Remember? So what. But he could lie and tell stories to save his neck. We talk about life. He puts his hand and talks about life. I am proud to stand up here for the State *50 and for [Bachelder] and be a voice for her. And let me do it real quickly. Hi. I’m [Bachelder], You didn’t hear me. You don’t know me. But let me tell you about my life real quick. I’ve had a tough life. I have got a husband. I have got children. I work. I take care of myself. I have a trailer. I have a mother who loves me. And I got hooked up with him. I made mistakes. And I put him out, told him to leave.
[[Image here]]
“And how did I get paid back? He came — and when I came home from work, and I was tired and I came home. And when I came in, he attacked me. He butchered me. He slaughtered me. I begged him, spare me. Quit stabbing me. Quit hurting me. I have got children. Quit stabbing me in the breast. Quit stabbing me in the arm. I want to live. Please don’t drag me around. Please don’t hurt me. I want to live, as he [whaled] and sliced her and killed her.
“And they want mercy? They want life. What’s a human life worth? You don’t give a squat about [the prosecutor’s] life. But [Bachelder’s] life was important to her and her children and her mother. He doesn’t deserve any kind of mercy in any manner or fashion.
“[Defense counsel] says, you will decide, and we want you to decide. But there’s [Bachelder]. I want you to remember what she says. This hurts. I’m feeling pain. I can’t breathe real good. I have blood coming out on my hands. It’s warm. This is what makes me alive. I see pictures of my children. Won’t somebody help me? Who is in the bathroom washing their hands. I can’t get to the phone. No neighbor will help me. Heath is torturing her, slaughtering her, doing things to her.
“He sits over there like he sits and looks at you. And they want mercy. And what’s pain? How do you describe pain? I don’t know. I know what pain is. You know what pain is. I asked the doctor, did she feel pain? Most assuredly. Was she tortured, in your opinion? Did she suffer? Did she feel it?”
(R. 1168-70.)
“ ‘During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’” Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000) (quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988), abrogated by Bethea v. Springhill Memorial Hasp., 833 So.2d 1 (Ala.2002)). “ ‘ “A prosecutor as well as defense counsel has a right to present his impressions from the evidence,” and “[h]e may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way.” ’ ” Sneed v. State, 1 So.3d 104, 139 (Ala.Crim.App.2007) (quoting Henderson, 584 So.2d at 856-57 (quoting in turn Watson v. State, 398 So.2d 320, 328 (Ala.Crim.App.1980))). Here, evidence was presented that Bachelder was a single mother raising two children and that she had worked the day she was murdered. The prosecutor’s remarks that Bachelder had a “tough life” and was “tired” when she got home from work the night she was murdered were reasonable inferences from this evidence. In addition, the remainder of the prosecutor’s remarks about what Bachelder may have been thinking and saying during the attack were also reasonable inferences from the evidence presented at trial regarding the attack. Therefore, this Court finds no error, much less plain error, as to this claim.
*51 D.
Fourth, McCray contends that the prosecutor improperly compared Bachelder’s rights to his rights and improperly argued that mercy was not a proper consideration for sentencing. Because McCray made no objection to either the prosecutor’s guilt-phase closing argument or penalty-phase closing argument, these claims are reviewed for plain error only. See Rule 45A, Ala. RApp. P.
McCray specifically challenges the following as an improper comparison of his rights with Bachelder’s rights during the prosecutor’s guilt-phase closing argument:
“And they want you to reward him by all the lies and stories and what he did by giving him manslaughter, heat of passion. That ain’t going to happen. That’s torture. Willful torture of another human being — that he loved her or he could treat her like that. Those are the kinds of things that happen in a war. And she is begging him.”
(R. 1017.) McCray also challenges the following statements by the prosecutor during his rebuttal penalty-phase closing argument as an improper comparison of his rights with Bachelder’s rights and an improper argument that mercy is not permitted at sentencing:
“And they want mercy? They want life. What’s a human life worth? You don’t give a squat about [the prosecutor’s] life. But [Bachelder’s] life was important to her and her children and her mother. He doesn’t deserve any kind of mercy in any manner or fashion.
[[Image here]]
“... It calls for the death penalty. Loudly and clearly, say, we, this jury, Heath McCray, find you guilty of the death penalty. And what we tell Judge Jackson — our decision is one, two, three aggravating circumstances, and do it unanimously, loudly and clearly, and send the message that you can’t butcher our women in this community and then come in here and say life.
“Life — he’ll be punished by going to prison for the rest of his life. [Bachelder’s] life was worth more than that. It’s her life. Taken away forever, forever. He ain’t got no right to do it. Mercy is what victims don’t get. He didn’t give her any. He is not entitled to any today. Do what’s right. Send the message that Heath McCray — know today and forever it’s death for the most horrible, sick, disgusting, evil acts that were committed against this woman. Thank you.”
(R. 1169-73.)
Contrary to McCray’s contention, that portion of the prosecutor’s guilt-phase closing argument quoted above was not a comparison of his rights to the rights of Bachelder, but rather, was a proper argument that the facts of the case did not support McCray’s claim of heat of passion. “The prosecution is entitled to ‘spotlight the defense’s strategy,’ and a prosecutor’s remarks during closing argument pointing out the flaws in the defense’s theory of the case do not constitute improper argument.” Reeves, 807 So.2d at 45.
To the extent that the prosecutor’s rebuttal penalty-phase closing argument could be considered a comparison of McCray’s rights with Bachelder’s rights, this comment did not rise to the level of plain error. This Court recently explained in Brown:
“It is improper for a prosecutor to argue the victim’s rights and to compare those rights to the rights of the defendant. However, as we stated in McNair [v. State, 653 So.2d 320 (Ala.Crim.App.1992) ]:
“ ‘The prosecutor made numerous references to the victim’s rights and sev *52 eral times implied that her rights were to be weighed against the appellant’s. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict. See Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990), affirmed, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992); Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App.1989), affirmed as to instant issue and remanded on other grounds, 585 So.2d 112 (Ala.1991) (on rehearing), affirmed on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992); Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App. 1988).’
“653 So.2d at 337-38. See also Calhoun v. State, 932 So.2d 923 (Ala.Crim.App. 2005), cert. denied, 548 U.S. 926, 126 S.Ct. 2984, 165 L.Ed.2d 990 (2006) (no reversible error when prosecutor commented that the defendant’s mother got to plead for his life but that the victim’s mother did not get to plead for her son’s life); Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003) (no reversible error when prosecutor argued that jury should consider the rights of the people living in the county in which the victim lived); Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000), aff'd, 820 So.2d 883 (Ala.2001), cert. denied, 535 U.S. 1058, 122 S.Ct. 1921, 152 L.Ed.2d 828 (2002) (no reversible error when prosecutor argued that it was not fair to the victim because she did not get a two-week trial like the defendant). For the reasons stated in McNair, we find no plain error.”
11 So.3d at 918-19. Similarly, here, this Court finds the jury valued the prosecutor’s remarks at them true worth, as uttered in the heat of debate, and holds that they did not so infect the trial as to make the resulting sentence a denial of due process.
Finally, the prosecutor’s argument that McCray deserved no mercy because he did not show mercy to Bachelder was a proper argument. “[I]t is not improper for the prosecutor to argue that the defendant showed the victims no mercy.” Mitchell, 84 So.3d at 1002. See also Melson, 775 So.2d 857. It was likewise a proper reply-in-kind to defense counsel’s closing argument asking the jury to show mercy to McCray and to sentence him to life imprisonment without the possibility of parole. See, e.g., Centobie v. State, 861 So.2d 1111 (Ala.Crim.App.2001) (prosecutor asking jury to show defendant the same mercy that he showed the victim was proper reply-in-kind to defense counsel’s plea for mercy); and Smith v. State, 797 So.2d 503 (Ala.Crim.App.2000) (prosecutor arguing that the defendant showed the victim no mercy was a permissible reply in kind to defense counsel’s plea for mercy). Therefore, this Court finds no error, much less plain error, as to these claims.
E.
Finally, McCray argues that the cumulative effect of the alleged prosecutorial misconduct in this case denied him a fair trial and warrants reversal of his conviction and sentence. This Court has considered each of the allegations of prosecutorial misconduct individually and has found that none of the allegations of error require reversal. After thoroughly reviewing the record and considering the allegations of prosecutorial misconduct cumulatively, this Court likewise finds that the cumulative effect of any alleged errors did not probably injuriously affect McCray’s substantial rights and also does not require reversal. See, e.g., Ex parte Woods, 789 So.2d 941, 942-3 n. 1 *53 (AIa.2001) (“The correct rule is that, while, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors had ‘probably injuriously affected substantial rights of the parties,’ then the cumulative effect of the errors may require reversal.”). Therefore, this claim is meritless.
V.
McCray next contends that the trial court erred in removing prospective juror G.F. for cause at the request of the State on the ground that she had not answered questions truthfully during voir dire examination. Specifically, McCray argues that G.F. did not intentionally mislead the parties or the court, but merely misunderstood the question posed and that when the question was later clarified, G.F. answered truthfully. McCray further argues that failing to answer questions truthfully during voir dire does not constitute a statutory or common-law ground for removing G.F. for cause and that G.F. exhibited no absolute bias to warrant her removal for cause.
The record reflects that during group voir dire, the prosecutor asked the following:
“Here’s one of those hard questions. I mentioned it — I kind of started out in my voir dire — I need to see a subpoena list, too, if I could.
“[Defense counsel], you were telling me — here is my question I need to know. My job as the district attorney is to try cases in Houston and Henry County. That’s the circuit we have. I live here just like you do. I go to Wal-Mart. I go to the ball games.
“Thank you, [defense counsel]. I’ll give it back to you.
“I have family. I have children. My parents are now deceased, but my parents would go places. Oh, there’s [the prosecutor’s] mother. He sent my loved one to death row. [The prosecutor] sent my son off to 99 years for rape. You know how parents are.
“Here’s my question. My job in our community is to try cases in Houston and Henry Counties. I want to ask you, when you came down here for jury service this week, you knew how many people were going to sit on the jury. Right? The max number? How many? 12. There may be an alternate or two. But my question to you is, does [the prosecutor] get to get in the jury box and get to vote and go back into the room where the 12 that gets to vote whether someone is convicted of capital murder or they get death? Do I get to do that? I don’t get to do that.
“So here’s my question. I understand human nature. I understand the question — that the State seeks to put the defendant to death, on the burden of proof as the law says it. I understand your looks. I was looking at you when I asked those questions about the burden of proof. Believe me, I was looking at your mind, your heart and soul the best I can as a human being, looking at you.
“My question is — I live here. I need to know if we’ve ever prosecuted a member of your family, you, yourself, a close friend? And what I mean by that, you know who is a close friend. Someone you grew up with. Not just an acquaintance. Okay? But your next-door neighbor, someone you played sports with in high school, that they or a member of their family was sent to prison for rape or robbery or murder — and they say, that [the prosecutor], he sent an innocent person to prison.
“We have already established I don’t get to vote. Right? Okay. But it’s important for me to know as the district *54 attorney — he wants a fair trial. We want a fair trial. So my question is this: If I have ever prosecuted you or a member of your family. I don’t want to know about speeding tickets. But I do want to know about any other offense. Any other felony. You don’t have to raise your hand. Any felony or misdemeanor — we have prosecuted you or any members of your family?
“In other words, I have tried cases, and we want to know — be honest — we have a list, too. So it’s kind of hard being the district attorney — Mr. Smith, would you please come up?
“Now, Mr. Smith, it’s true I prosecuted you on such and such a day?
‘Yes, it is.
“So it puts me in a bad position. I’ll do it, because it’s my job. I want a fair trial just like he wants a fair trial.
“So I guess what I’m asking you is— here is the second part that goes with it. I do want to know if we’ve ever prosecuted any member of your family, in juvenile court, circuit court. I don’t want to know about civil court. I don’t want to know about divorces. That’s none of my business. I don’t want to know about custody fights. That’s none of my business. I said criminal court. In other words, circuit, district, you know, traffic court. I don’t want to know about speeding.
“I would want to know about a DUI, you know, excessive speeding, where a man is eluding. But not speeding or running a stop sign. I don’t want to know about that. I don’t do the prosecutions for the City of Dothan. But if they are there, I want to know, because we have records, too. So I need to know that. Tell us that confidentially. A couple of people have already responded up front. Those that have already told us don’t have to come up or tell us that. So I would like to know that, please.”
(R. 99-103.) Following group voir dire, G.F. was questioned individually as follows:
“[G.F.]: Hi. I’m [G.F.].
“THE COURT: Yes, [G.F.]?
“[G.F.[20] ]: I’m sure that [the prosecutor] or [defense counsel],[21] one, has prosecuted one of my family members. Not that it would affect my judgment, but I thought you guys should know.
“THE COURT: You think you have some family members that have been prosecuted?
“[G.F.]: Yes.
“THE COURT: And I believe you said your position is that it shouldn’t affect you in the case in any way?
“[G.F.]: No.
“THE COURT: Any questions, [prosecutor]?
“[Prosecutor]: No. Thank you for your honesty.
“THE COURT: Or, [defense counsel]?
“[Defense counsel]: No, sir.”
(R. 189-90.)
After voir dire examination had concluded, the following occurred:
“[Prosecutor]: Judge, the only problem I have — [G.F.], we show we have actually prosecuted her. She has theft of property convictions and possession of a controlled substance herself. So I am *55 going to strike her. You know, I just— she said her family. But it’s her, too. So I either have to bring her back in, unless they are not going to object — I am just telling my basis. I am going to strike her for family members whether they like it or not.
“One of them said they didn’t — [defense counsel], like [prospective juror D.H.], and I am going to strike her, too. But, you know, the Courts — the appellate courts either want me to bring her in or be able to prove it. So I can get my file, or if we need to, bring her back in.
“THE COURT: We can bring her back in, I guess. Did everybody come up to the bench?
“[G.F.], you had indicated you had various family members who have been prosecuted. Have you ever been prosecuted for something?
“[G.F.]: I mean, I have pled guilty before it got that far. It was a drug case where my husband was involved— my ex-husband — and I pleaded guilty, because I did know about it. I mean, it wasn’t me personally, but I did know about him—
“THE COURT: So you have had a case yourself, also?
“[G.F.]: Yes.
“THE COURT: We just wanted to get that straight and make sure you are the same person.
“[G.F.]: Uh-huh. That would be me.
“[Prosecutor]: Thank you for your honesty, ma’am. You did come up. Thank you.”
(R. 200-01.) After the parties challenged several other prospective jurors for cause, the following occurred:
“[Prosecutor]: I move to strike [G.F.], because she wasn’t truthful on hers. In other words, I proved to the Court that, you know, it was her, and not just family members. I am entitled to a truthful response specifically from her. And I asked that question and to bring her back in. So I would move to strike her for cause.
“THE COURT: What says the defense?
“[Defense counsel]: Your Honor, we feel that that does not rise to that level of being a strike for cause. She did, when specifically asked by [the prosecutor] if she had been prosecuted—
“THE COURT: I will strike her for cause.
“[Defense counsel]: We except and we cite as grounds all the material I have stated, plus what’s in our separately filed memorandum.”
(R. 208-09.)
Without deciding whether a trial court may grant a party’s for-cause challenge of a prospective juror who was dishonest during voir dire, this Court holds that error, if any, in removing prospective juror G.F. was harmless.[22] Rule 45, Ala. RApp. P. In Dailey v. State, 828 So.2d 340, 343 (Ala.2001), the Alabama Supreme Court held that this Court had “erred in failing to perform a harmless-error analysis” after determining that the trial court had improperly removed a prospective juror for cause. The Alabama Supreme Court went on to explain:
“Rule 45, Ala. R.App. P., reads:
*56 “ ‘No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected the substantial rights of the parties.’
“In Evans v. State, [794 So.2d 411 (Ala.2000) ], the trial court had granted the State’s challenge of a veniremember for cause based upon the fact that she was married to defense counsel’s uncle. The Court of Criminal Appeals held that the trial court had erred in granting the challenge and that Evans’s constitutional right to a fair trial had been violated. Therefore, the Court of Criminal Appeals reversed Evans’s convictions. This Court held that the trial court had erred in granting the State’s challenge for cause, but held that the error was ‘harmless error’ under Rule 45, Ala. R.App. P. We reasoned in Evans that the defendant’s constitutional rights had not been violated:
“ ‘Evans argues that the trial court’s error in excusing [venire-member] E.F.W. violated his right to a trial by an impartial jury, a right guaranteed by Amendments 6 and 14 of the United States Constitution and § 6 of the Alabama Constitution. However, the United States Supreme Court has held that a defendant’s federal right to an impartial jury was not automatically violated merely by an erroneous ruling on a challenge for cause. Ross v. Oklahoma, 487 U.S. 81, 87-88 [, 108 S.Ct. 2273, 101 L.Ed.2d 80] (1988); see also United States v. Martinez-Salazar, 528 U.S. 304 [, 120 S.Ct. 774, 145 L.Ed.2d 792] (2000). As long as the jury that heard the case was impartial, the right guaranteed by the United States Constitution was not violated. See Ross, 487 U.S. at 87-88 [, 108 S.Ct. 2273]. This rule would also apply to § 6 of the Alabama Constitution, which gives the defendant the right to a trial “by an impartial jury of the county or district in which the offense was committed.” The plain meaning of this language is that the defendant is entitled only to an impartial jury and that unless the defendant can show that a trial court’s erroneous ruling during jury selection prevented the jury from being impartial, there is no violation of § 6.’
“794 So.2d at 414.
“Here, Dailey has made no showing that her right to an impartial jury was probably injuriously affected by the trial court’s error in removing K.K. Therefore, we conclude that the trial court’s error in removing K.K. was not reversible, because, even with the error, Dailey had a fair trial with an impartial jury. The judgment of the Court of Criminal Appeals is reversed and the case is remanded.”
Dailey, 828 So.2d at 343-4.
Similarly, McCray “has made no showing that [his] right to an impartial jury was probably injuriously affected by the trial court’s error[, if any,] in removing [potential juror G.F.]” Id. at 343. Further, this Court’s review of the record has failed to reveal any probable prejudice resulting from the removal of potential juror G.F. Therefore, the trial court’s error, if any, in removing G.F. was harmless because McCray had a fair trial with an impartial jury.
*57 VI.
McCray next contends that the trial court erred in denying his motion to suppress the statement he made to police as well as the DNA sample taken from him on the ground that he did not knowingly and voluntarily waive his Miranda rights. Specifically, he argues that his low intelligence level rendered him incapable of knowingly and voluntarily waiving his rights. He also argues that the trial court erred in admitting into evidence, and playing for the jury, over his objection, the videotape of his statement because he believes that the tape was not properly authenticated.
Before trial, McCray filed a motion to suppress his statement in which he asserted the following: 1) there was no probable cause to arrest or detain him at the time he made his statement; 2) “[t]he questioning took place in an inherently coercive setting”; and 3) the statement was taken “without properly Mirandizing him” and without properly “obtaining] a waiver of his right against self-incrimination.” (C. 348-49.) At trial, McCray requested and received a continuing objection to the admission of his statement and all evidence obtained during or after his statement on the same grounds as those raised in his motion to suppress. McCray, however, never argued that his low intellectual functioning rendered his waiver of his Miranda rights involuntary. In addition, although McCray objected at trial to the alleged lack of authentication of the videotape of his statement, he did so only when the videotape was about to be played for the jury, which was after the videotape had already been admitted into evidence without any objection (see explanation below). Therefore, because neither of these claims was properly preserved in the trial court, this Court reviews them for plain error only. See Rule 45A, Ala. RApp. P.

Voluntariness

At the pretrial hearing on McCray’s motion to suppress, Detective Frank Meredith testified, as he did at trial, that the afternoon that Bachelder’s body was found McCray voluntarily came to the police station to speak with police. According to Detective Meredith, when McCray initially arrived, he was not a suspect and was not under arrest. Although McCray was free to leave at any time, Detective Meredith nonetheless advised McCray of his Miranda rights. Detective Meredith said that McCray appeared to understand his rights and that McCray specifically stated that he understood his rights. McCray then signed a waiver-of-rights form. McCray did not appear to be under the influence of alcohol or narcotics and he appeared to understand everything that was said to him. According to Detective Meredith, McCray had completed high school, and he knew McCray personally and knew that McCray understood the English language. Detective Meredith further testified that neither he nor any other officer present threatened McCray or offered McCray any reward for making a statement. Detective Meredith stated at the suppression hearing that he initially spoke with McCray in the conference room briefly and that McCray then requested a polygraph examination. Once the polygraph was completed and he had received the results, Meredith then questioned McCray in an interview room. Before the interrogation began, Meredith reminded McCray of his Miranda rights, and McCray indicated that he understood his rights and that he was still willing to speak with him.[23] Detective Meredith also testi- *58 fled that at approximately 3:00 p.m. that afternoon, just before the polygraph examination, he requested and received McCray’s consent to take a DNA sample.
Regarding confessions, this Court has explained:
“The general rule is that a confession or other inculpatory statement is prima facie involuntary and inadmissible and the burden is on the State to prove by a preponderance of the evidence that such a confession or statement is voluntary and admissible. See, e.g., Ex parte Price, 725 So.2d 1063 (Ala.1998). To prove voluntariness, the State must establish that the defendant ‘made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him.’ Lewis v. State, 535 So.2d 228, 235 (Ala.Crim.App.1988). If the confession or inculpatory statement is the result of custodial interrogation, the State must also prove that the defendant was properly advised of, and that he voluntarily waived, his Miranda rights. See Ex parte Johnson, 620 So.2d 709 (Ala.1993), and Waldrop v. State, 859 So.2d 1138 (Ala.Crim.App.2000), aff'd, 859 So.2d 1181 (Ala.2002).”
Eggers v. State, 914 So.2d 883, 898-99 (Ala.Crim.App.2004). “ ‘Whether a [Miranda] waiver is voluntary, knowing, and intelligent depends on the particular facts and underlying circumstances of each case, including the background, experience, and conduct of the accused — i.e., the totality of the circumstances.’ ” Waldrop v. State, 859 So.2d 1138, 1156 (Ala.Crim.App.2000), aff'd, 859 So.2d 1181 (Ala.2002) (quoting Click v. State, 695 So.2d 209, 218 (Ala.Crim.App.1996)). “The fact that a defendant may suffer from a mental impairment or low intelligence will not, without other evidence, render a confession involuntary.” Baker v. State, 557 So.2d 851, 853 (Ala.Crim.App.1990). “‘A defendant’s mental impairment, even if it exists, is merely one factor affecting the validity of his waiver or rights and the voluntariness of his confession.’ ” Dobyne v. State, 672 So.2d 1319, 1337 (Ala.Crim.App.1994), aff'd, 672 So.2d 1354 (Ala.1995) (quoting Whittle v. State, 518 So.2d 793, 796-97 (Ala.Crim.App.1987)). As this Court explained in addressing a similar issue in Byrd v. State, 78 So.3d 445 (Ala.Crim.App.2009):
“A defendant’s low IQ is only one factor that must be considered when reviewing the totality of the circumstances. See Dobyne v. State, 672 So.2d 1319, 1337 (Ala.Crim.App.1994); Beckworth v. State, 946 So.2d 490, 517 (Ala.Crim.App.2005). ‘While an accused’s intelligence and literacy are important factors, ... weak intellect or illiteracy alone will not render a confession inadmissible.’ Hobbs v. State, 401 So.2d 276, 282 (Ala.Crim.App.1981); see also Hodges v. State, 926 So.2d 1060, 1073 (Ala.Crim.App.2005) (same); cf. Colorado v. Connelly, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that mental defects alone are insufficient to establish that a confession was involuntary under the Due Process Clause). As this court stated in Beckworth: ‘[A] defendant’s low IQ does not preclude a finding that a Miranda waiver was voluntary unless the defendant is so mentally impaired that he did not understand his Miranda rights.’ 946 So.2d at 517 (citing Dobyne, 672 So.2d at 1337); see Moore v. Dugger, 856 F.2d 129, 132 (11th Cir.1988) (mental deficiencies, in the absence of police coercion, are not sufficient to establish involuntariness, and the fact that the defendant was *59 generally calm and responsive during interrogation, that he did not appear confused, and that he understood the questions put to him established a valid waiver of Miranda rights, despite the defendant’s low IQ).”
78 So.3d at 453-54.
As noted in Part IX of this opinion, there is nothing in the record indicating that McCray suffered any mental deficiencies or, as McCray refers to it, that his “intellectual abilities are limited” in any way. (McCray’s brief, at 74.) Although McCray’s sister testified at the penalty phase of the trial that McCray was in special-education classes in his youth, no evidence was presented as to, and the record does not otherwise indicate, the reason McCray was in special-education classes. Further, this Court has watched McCray’s recorded statement and has read his testimony at trial, and it is abundantly clear that McCray’s intellectual functioning is not so low as to justify a finding that he was unable to understand his Miranda rights. Detective Meredith, who knew McCray personally, testified that McCray had finished high school and that he understood the English language. He further testified that McCray indicated that he understood his rights and that he was willing to waive them. After thoroughly reviewing the record, it is clear that McCray’s statement was knowing and voluntary and that he knowingly and voluntarily consented to the collection of the DNA sample. Therefore, this Court finds no error, much less plain error, in the trial court’s denial of McCray’s motion to suppress.

Authentication

During Detective Meredith’s testimony at trial, the following occurred:
“[Prosecutor]: Okay. Just what I’m asking you, in other words, have you watched the original tape from the time you were in there with Heath McCray and [Sgt.] Cirulli until the time the interview was over, in other words, you actually placed him under arrest, took him into custody for the capital murder case with [Bachelder], Correct?
“[Detective Meredith]: Yes, sir.
“[Prosecutor]: Now, my question to you: When you left the room, can you tell them, the recording equipment, would it have been stopped in any manner or fashion at any time when he was being interviewed by you or when you left and [Sgt.] Cirulli was in there?
“[Detective Meredith]: No, sir.
“[Prosecutor]: Would you have had the opportunity to be outside watching any questions between Heath McCray and [Sgt.] Cirulli while you were out of the room?
“[Detective Meredith]: Yes, sir. We have our — the video set up where it will run feed into another room, into a conference room, when we first start the interview where we can watch the interview in progress.
“[Prosecutor]: Would you tell the ladies and gentlemen of the jury, if [Sgt.] Cirulli left the room and you were in there, did the tape continue to run and operate?
“[Detective Meredith]: I believe so, yes.
“[Prosecutor]: Well, you believe so. My question is, in other words, you watched the entire tape from the first to the end. Are there any breaks where it goes blank at any time and then it starts back up? That doesn’t occur, does it?
“[Detective Meredith]: No, sir.
“[Prosecutor]: So when you were in there or [Sgt.] Cirulli was in there or whoever left, it continued to record with which detective was with him. Right?
*60 “[Detective Meredith]: Correct. Michael Cirulli was in there while I was out of the room and then vice versa.
“[Prosecutor]: Now, did you have an occasion after the tape was made to watch it, to see if it truly and accurately depicted the evidence of what you said or what [Sgt.] Cirulli said or what Heath Lavon McCray said?
“[Detective Meredith]: Yes, sir.
“[Prosecutor]: And did it do that in your opinion?
“[Detective Meredith]: Yes, sir.
“[Prosecutor]: And in your opinion, was the equipment working properly, in other words, before the interview started, in other words, by you, yourself, watching it afterwards, seeing yourself, [Sgt.] Cirulli or Heath Lavon McCray?
“[Detective Meredith]: Yes, sir.
[[Image here]]
“(Thereupon, State’s Exhibit No. 1 was marked for identification.)
“[Prosecutor]: I’m showing you State’s Exhibit 1 that was previously marked and admitted at a deposition![24]] Did you have the opportunity to watch State’s 1 under oath?
“[Detective Meredith]: Yes, sir, I did.
“[Prosecutor]: And did it truly and accurately depict the interview, once again, with you and McCray and [Sgt.] Cirulli?
“[Detective Meredith]: Yes, sir.
“[Prosecutor]: It hasn’t been marked, altered or changed in any way from the time you turned it in to evidence to the time it was turned over to the deposition. Correct?
“[Detective Meredith]: Yes, sir.
[[Image here]]
“[Prosecutor]: Okay. I offer State’s 1 into evidence, Your Honor, at this time, the interview, Judge Jackson.
“THE COURT: And it is admitted over previous and continuing objection of the defendant![25]]
“[Defense counsel]: Thank you, Your Honor.
“[Prosecutor]: Judge, can I pull him down, please, and put on a short witness in between?
“THE COURT: Yes.”
(R. 675-78.) The prosecutor then called another witness to testify, after which, the following occurred:
“[Prosecutor]: Thank you. We could go to the tape, Your Honor.
“THE COURT: That’s correct.
“[Defense counsel]: Before we play the tape, I do need to ask Investigator Meredith something on voir dire.
“THE COURT: All right.
“[Prosecutor]: I’ll bring him back in.
“[Defense counsel]: That goes to an issue beyond what we have previously raised—
“THE COURT: All right.
“[Defense counsel]: —and that is specific to the tape.
“THE COURT: All right.
“[Defense counsel]: Thank you, Your Honor.
[[Image here]]
“[Defense counsel]: Is the — you saw [the prosecutor] putting a tape into the machine — did you?
“[Detective Meredith]: No, I did not.
“[Defense counsel]: Okay. I am going to ask [the prosecutor] to eject it *61 just for a moment, please. And I’m going to show you just the tape that is marked as State’s Exhibit No. 1.
“[Detective Meredith]: Yes, sir.
“[Defense counsel]: Okay. What identifying mark on the tape case itself shows that that is your tape?
“[Detective Meredith]: That it is my tape?
“[Defense counsel]: Yes, sir, the one that you actually recorded?
“[Detective Meredith]: I didn’t record anything.
“[Defense counsel]: Okay.
“[Detective Meredith]: One of the other detectives actually handled the recording.
“[Defense counsel]: Okay. What police department marking shows that it was the tape used to tape Mr. McCray’s alleged statement?
“[Detective Meredith]: The case number, capital murder, and interview with Heath Lavon McCray.
“[Defense counsel]: Okay. Now, my question to you is this: On a — any video — any standard videotape, there is a leader on there, isn’t there?
“[Detective Meredith]: Yes.
“[Defense counsel]: And the term leader refers to some clear tape at the front end, so to speak?
“[Detective Meredith]: Correct.
“[Defense counsel]: Has anybody, to your knowledge, marked or authenticated that leader?
“[Detective Meredith]: I have no idea.
“[Defense counsel]: Is that customary in your department to do that?
“[Detective Meredith]: That’s — I don’t deal with the videotapes. So that’s — you would have to have someone that — the detective that handles the technical side of that.
“[Defense counsel]: Okay. Then, Your Honor, I add to my previous objection the ground that the tape is inadequately authenticated. Thank you.
“THE COURT: And the objection is overruled.”
(R. 685-88.) After a few more questions by the prosecutor regarding the markings on the videotape, the tape was played for the jury.
In Ex parte Fuller, 620 So.2d 675 (Ala.1993), the Alabama Supreme Court explained the two methods for laying the foundation for the admissibility of an audiotape or videotape:
“The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the ‘silent witness’ foundation must be laid. Under the ‘silent witness’ theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the ‘silent witness’ theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong Voudrie [v. State, 387 So.2d 248 (Ala.Crim.App.1980),] test. Rewritten to have more general application, the Voudrie standard requires:
“(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a wit *62 ness been present at the scene or event recorded,
“(2) a showing that the operator of the device or process or mechanism was competent,
“(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,
“(4) a showing that no changes, additions, or deletions have been made,
“(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,
“(6) identification of the speakers, or persons pictured, and
“(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.
“On the other hand, when a qualified and competent witness can testify that the sound recording or other medium accurately and reliably represents what the witness sensed at the time in question, then the foundation required is that for the ‘pictorial communication’ theory. Under this theory, the party offering the item must present sufficient evidence to meet the ‘reliable representation’ standard, that is, the witness must testify that the witness has sufficient personal knowledge of the scene or events pictured or the sounds recorded and that the item offered accurately and reliably represents the actual scene or sounds.”
620 So.2d at 678.
Here, Detective Meredith’s testimony was sufficient to authenticate the videotape of McCray’s statement. Detective Meredith testified that he had watched the tape and that the tape was an accurate representation of what had transpired during the interview with McCray. Although Detective Meredith left the room at some point during the interview, “positive identification of every sound on a tape recording is not necessary for its admission.” Johnson v. State, 823 So.2d 1, 24 (Ala.Crim.App.2001). Rule 901(a), Ala. R. Evid., provides that “authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.” Rule 901(b)(1), Ala. R. Evid., provides that “[t]estimony that a matter is what it is claimed to be” is sufficient authentication “conforming with the requirements of this rule.” Under Rule 901, Ala. R. Evid., and the “pictorial communication” theory, Detective Meredith’s testimony was sufficient to authenticate the videotape. Therefore, this Court finds no error, much less plain error, in the admission of the videotape of McCray’s statement to police.
VII.
McCray also contends that the trial court committed several evidentiary errors during the guilt phase of his trial.
Initially, this Court notes that “ ‘[t]he admission or exclusion of evidence is a matter within the sound discretion of the trial court.’ ” Hinkle v. State, 67 So.3d 161, 164 (Ala.Crim.App.2010) (quoting Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001)). “The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion^]” Ex parte Loggins, 771 So.2d 1093, 1108 (Ala.2000). With these principles in mind, this Court addresses each of McCray’s arguments in turn.
A.
McCray first argues that the trial court erred in admitting into evidence a video *63 tape of the crime scene, numerous photographs of the crime scene, and several autopsy photographs of the wounds on Ba-chelder’s body taken just before the autopsy was performed. He argues that the videotape and photographs were gruesome, were largely duplicative, and were offered solely to inflame the jury and that their prejudicial effect outweighed any probative value.
The record reflects that, before trial, McCray filed a motion in limine to prohibit the State from introducing prejudicial photographs. The motion did not mention the videotape of the crime scene. The trial court deferred ruling on the motion. At trial, the State offered numerous photographs of the crime scene and of Bachelder just before the autopsy. McCray objected to the autopsy photographs — State’s Exhibit 25 (a collection of 15 autopsy photographs), and State’s Exhibit 31 (a collection of 24 autopsy photographs) — but did not object to the crime-scene photographs — State’s Exhibits 3-14, 18-24, 26 and 27, and 79 (a collection of 73 photographs of the crime scene). McCray likewise did not object to State’s Exhibit 17, the videotape of the crime scene. Therefore, this Court reviews McCray’s challenge to the admission of the crime-scene photographs and the videotape of the crime scene for plain error only. See Rule 45, Ala. R.App. P.
“ ‘Generally, photographs are admissible into evidence in a criminal prosecution “if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.” ’ Bankhead v. State, 585 So.2d 97, 109 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), affd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d, 625 So.2d 1146 (Ala.1993), quoting Magwood, v. State, 494 So.2d 124, 141 (Ala. Crim.App.1985), aff'd, 494 So.2d 154 (Ala.1986). ‘Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome.’ Williams v. State, 506 So.2d 368, 371 (Ala.Crim.App.1986) (citations omitted). In addition, ‘photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.’ Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989). ‘This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim’s injuries.’ Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). ‘ “[Ajutopsy photographs depicting the character and location of wounds on a victim’s body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.” ’ Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to, 851 So.2d 453 (Ala.2002). ‘The same rule applies for videotapes as for photographs: “The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury.” ’ Siebert v. State, 562 So.2d 586, 599 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.1990), quoting Walker v. State, 416 So.2d 1083, 1090 (Ala.Crim.App.1982). See also Ward v. State, 814 So.2d 899 (Ala.Crim.App.2000). Generally, ‘[a] properly authenticated video tape recording of the scene of the crime constitutes competent evidence’ and ‘is admis *64 sible over the defendant’s objections that the tape was inflammatory, prejudicial, and cumulative.’ Kuenzel v. State, 577 So.2d 474, 512-13 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991). ‘Provided that a proper foundation is laid, the admissibility of videotape evidence in a criminal trial is a matter within the sound discretion of the trial judge.’ Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Crim.App.1986).”
Brooks v. State, 973 So.2d 380, 393 (Ala.Crim.App.2007).
This Court has thoroughly reviewed all the autopsy photographs and the crime-scene photographs, and it has watched the videotape of the crime scene.[26] The photographs and the videotape were relevant and admissible to show the scene of the crime and the extent of the wounds to Bachelder’s body. Although certainly unpleasant, they are not unduly gruesome, and this Court concludes that their prejudicial effect did not outweigh their probative value. Therefore, this Court finds no error, much less plain error, in the admission of the photographs and videotape.
B.
Second, McCray argues that the trial court erred in admitting into evidence inked footprints taken from him at the municipal jail after his arrest. Specifically, he argues, as he did at trial, that the person who took his footprints, John Thomas, who worked at the Dothan municipal jail at the time of McCray’s arrest, “did not possess the requisite ‘knowledge, skill, experience, training, or education’ to take [his] footprints. Ala. R. Evid. 702.” (McCray’s brief, at 80.)
Thomas testified at trial that he had worked for the Dothan municipal jail for approximately a year and a half before McCray’s arrest. Although McCray was, according to Thomas, the first person from whom he had taken footprints, he said that he had taken thousands of fingerprints and that he had received training while working at the jail on how to take both a person’s fingerprints and footprints. With respect to his training, Thomas testified that he received on-the-job training, including taking classes and reading literature on how to take fingerprints and footprints. Thomas also explained the procedure he used in taking McCray’s footprints. According to Thomas, he laid out pieces of white paper along the floor. He then had McCray remove his shoes and socks, and he rolled the bottom of McCray’s feet with ink. After McCray’s feet were inked, he had McCray stand on and walk across the sheets of paper. Thomas said he obtained basic biographical information from McCray and wrote it on the sheets of paper with McCray’s footprints. Thomas also signed each sheet containing the footprints. Thomas also said that McCray signed some of the sheets but then refused to sign the remaining sheets.
First, McCray’s reliance on Rule 702, Ala. R. Evid., is misplaced. Rule 702, Ala. R. Evid., governs the admissibility of expert testimony, and provides:
“If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may *65 testify thereto in the form of an opinion or otherwise.”
McCray cites no authority, and this Court has not found any, that stands for the proposition that only experts may take an accused’s footprints or fingerprints. Thomas was not proffered by the State as an expert in fingerprint or footprint analysis; his testimony did not consist of any scientific, technical, or other specialized knowledge; and he offered no expert opinion. Rather, Thomas merely testified about his duties at the jail and his taking of McCray’s footprints. Although certainly a person who takes fingerprints or footprints must have some training in doing so, that training does not have to establish the person as an expert or satisfy the requirements of Rule 702, Ala. R. Evid.
Further, Thomas testified that he had received on-the-job training in the form of taking classes and reading literature on how to take both fingerprints and footprints and that he had been working at the jail for approximately a year and a half at the time he took McCray’s footprints. In addition, the State’s fingerprint expert, Shannon Fitzgerald, specifically testified that the footprints she received that were identified as McCray’s footprints were good impressions and contained “enough ridge detail to make an identification.” (R. 837.) Under these circumstances, this Court finds no error in admitting McCray’s footprints.
C.
Finally, McCray argues that the trial court erred in allowing Cpl. Mike Etress to testify that “Bachelder’s wounds were consistent with a knife found at the scene and ... her wounds were defensive” because, he says, Cpl. Etress was not qualified as an expert under Rule 702, Ala. R. Evid., to provide his opinion about Bachelder’s wounds. (McCray’s brief, at 80.)
The record reflects that during direct examination, Cpl. Etress initially described the crime scene and some of the wounds on Bachelder’s body, and explained to the jury the nature of defensive wounds. Later during direct examination, the following occurred, in pertinent part:
“[Cpl. Etress]: She had several injuries on her neck on both sides that appeared to be knife wounds.
“[Prosecutor]: When you say several, are we talking about one or two or more than that?
“[Cpl. Etress]: Three or four on each side.
“[Prosecutor]: Could you tell the ladies and gentlemen of the jury, in your opinion, could one knife have caused those individual wounds at one time in your opinion?
“[Cpl. Etress]: No, sir.
“[Prosecutor]: Go ahead.
“[Cpl. Etress]: She had three to four injuries on both sides of her neck that were consistent with the knife that I had located on the sofa. They were approximately three-quarters to an inch wide. They varied in the difference in the depth.
[[Image here]]
“[Prosecutor]: Cpl. Etress, what other injuries did you see, please, sir?
“[Cpl. Etress]: She had an injury to her left elbow.
“[Prosecutor]: Was that small or large that you saw?
“[Cpl. Etress]: It was large and consistent with the knife, as well.
“[Prosecutor]: Now, when you say elbow, kind of help me. In other words, if you could use your arm. I know you have got a coat on. But if you hold your palm open-faced, is it on the inside here or on the outside?
*66 “[Cpl. Etress]: It was completely through.
“[Prosecutor]: Both sides. Correct?
“[Cpl. Etress]: Yes, sir.
[[Image here]]
“[Prosecutor]: Now, could you tell— once again, you said it went all the way through. Could you see the other side?
“[Cpl. Etress]: At that time, we did not know that it had went all the way through until the autopsy.
“[Prosecutor]: But after the autopsy or watching the autopsy, could you tell it went all the way through?
“[Cpl. Etress]: That’s correct.
“[Prosecutor]: And could you tell, in other words, watching the autopsy, the entrance and exit, you know, if it was like the size of a little pin or a little letter opener, the width or size, that you saw, or was it bigger than that?
“[Cpl. Etress]: It was consistent with the knife that we found on the sofa.
“[Prosecutor]: Now, did she have any other injuries?
“[Cpl. Etress]: Yes, sir.
“[Prosecutor]: On her hands?
“[Cpl. Etress]: On her hands, yes, sir. She had several or multiple defensive wounds on her hands, fingers.
“[Prosecutor]: Tell me about those. In other words, just one or two? Where were they? Do you remember?
“[Cpl. Etress]: She had one in the— between the thumb and finger. That injury was to the bone, approximately an inch and a half, two inches deep. She had a couple across the fingers that were to the bone. One of the fingers was nearly severed. Just several defensive wounds where she had grabbed the knife while she was being stabbed.
“[Prosecutor]: Could you tell the ladies and gentlemen of the jury, in your opinion, could they have been caused with one attempt to stab her — in the location and position of which you saw on her fingers, inside or outside of the thumb?
“[Cpl. Etress]: No, sir.
“[Prosecutor]: After her shirt was taken off, in other words, the black Family Dollar shirt at the autopsy, did you see any wounds on her chest or abdomen?
“[Cpl. Etress]: Yes, sir.
“[Prosecutor]: What did she have there?
“[Cpl. Etress]: She had several punctures where the knife had been placed against her chest. And she had a puncture wound to the left breast that went completely through. And that injury was also consistent with the knife that we found.
“[Defense counsel]: Your Honor, I am going to object to this officer repeatedly testifying that a particular injury was consistent with a particular cause. That, again, is a matter of the pathologist. That’s outside—
“THE COURT: I’ll overrule the objection. But ladies and gentlemen — I assume the witness is talking about the width of the wound and the width of the knife.
“[Prosecutor]: I’ll ask him.
“[Prosecutor]: Was it the width of the knife that you observed on the breast or any other parts of the body — let me just show you, for the record, in other words, what I’m asking specifically.
“State’s Exhibit No. 16 [the butcher knife], in reference to the injuries or any cutting or any depth on the body of [Bachelder], is that what you are referring to specifically, consistent — in other words, because of the size and the angle *67 of the knife in your opinion, what you saw?
“[Cpl. Etress]: I’m referring to the width of the knife blade.
“[Prosecutor]: And this is 16. In other words, I’ll hold it up. You’re referring to the width you’re talking about?
“[Cpl. Etress]: The wide part.
“[Prosecutor]: The wide part.
“[Prosecutor]: So limited to that.
“THE COURT: The objection is overruled in light of that clarification.
(R. 591-96.)
McCray did not object to Cpl. Etress’s testimony that the wounds on Bachelder’s hands were defensive wounds, and his objection to Cpl. Etress’s opinion that many of the wounds on Bachelder’s body were consistent with the butcher knife found at the scene was untimely. See, e.g., Roper v. State, 695 So.2d 244, 246 (Ala.Crim.App.1996) (“ ‘An objection to a question, made after an answer is given, is not timely and will not preserve the issue for review.’ ” (quoting Scott v. State, 624 So.2d 230, 234 (AIa.Crim.App.1993))). Therefore, this Court will review these claims for plain error only. See Rule 45A, Ala. RApp. P.
As noted above, Rule 702, Ala. R. Evid., upon which McCray relies, governs expert testimony. However, as can clearly be seen from the above-quoted portion of the record, Cpl. Etress was not testifying as an expert when he stated that Bachelder’s wounds were consistent with the butcher knife found at the scene or that the wounds on Bachelder’s hands were defensive wounds. Rather, he was testifying as a lay witness to his personal observations of the width of the wounds and the width of the knife. Rule 701, Ala. R. Evid., provides:
“If the witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.”
Cpl. Etress’s testimony that several of Ba-chelder’s wounds were consistent in width with the butcher knife found at the scene and his testimony that the wounds to Ba-chelder’s hands were defensive wounds was rationally based on his perception and was helpful to a clear understanding of his testimony. See, e.g., Ex parte Sharp, [Ms. 1080959, December 4, 2009] — So.3d— (Ala.2009). Therefore, this Court finds no error, much less plain error, in the admission of Cpl. Etress’s testimony.
VIII.
McCray next contends that the trial court erred in denying his motion for a change of venue on the ground that there was extensive and prejudicial pretrial publicity. Specifically, he argues that news reports about his involvement in Bachelder’s murder, his statements to police about the crime, and his prior criminal history were presumptively prejudicial and warranted a change of venue.
Before trial, McCray filed a motion for a change of venue in which he argued that the publicity surrounding the case “[a]t each stage of the criminal proceedings” was so extensive that it would be impossible for him to receive a fair trial in Houston County. (C. 340.) He further argued in the motion that “inadmissible evidence and evidence otherwise outside the province of proper jury consideration” was extensively publicized in such a prejudicial manner that prejudice should be presumed and a change of venue granted. (C. 343.) At the August 23, 2006, pretrial motion hearing, McCray presented evidence in support of his motion. Marja Louradour, custodian of records at The Dothan Eagle *68 newspaper, testified that six articles had been published in The Dothan Eagle regarding Bachelder’s murder and that circulation for The Dothan Eagle was approximately 34,000 in 2005 and 2006. The six articles were introduced into evidence by the defense at the hearing. Wayne May, assignment editor for WTVY-TV in Do-than, testified that WTVY-TV broadcast 18 reports about Bachelder’s murder over the course of the previous year and that WTVY-TV broadcasts reach “almost a quarter of a million people in 41 counties and three states.” (August 23, 2006, Motion Hearing, R. 16.)[27] Recordings and transcripts of the broadcasts about Ba-chelder’s murder were introduced into evidence by the defense at the hearing. Finally, Ken Curtis, news director of WDHN-TV 18 in Dothan, testified that WDHN-TV 18 broadcast three reports about Bachelder’s murder, all three of which were in the three days immediately following the murder. Recordings and transcripts of those broadcasts were introduced into evidence by the defense at the hearing. During the hearing, both May and Curtis testified on cross-examination that they had been covering criminal proceedings in Houston County for many years, including numerous capital trials and that, in their opinion, McCray’s trial had not received much media coverage in comparison to other capital cases. The trial court denied the motion following the hearing.
“The right of an accused to be tried by a fair and impartial jury is guaranteed by the Sixth Amendment of the United States Constitution which states that ‘In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury....’ Article I, § 6 of the Alabama Constitution of 1901 states, in part: ‘That in all criminal prosecutions, the accused has a right to ... a speedy, public trial, by an impartial jury.... ’
“The Supreme Court of the United States has held that if an accused can not obtain an impartial jury in the district where he is being tried then the court should transfer the case to another district where the jurors are free of bias. Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). This guarantee has also been codified in this state in Ala.Code 1975, § 15-2-20. Rule 10.1, A.R. Cr. P. is to the same effect.”
Hunt v. State, 642 So.2d 999, 1042 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).
“When requesting a change of venue, ‘[t]he burden of proof is on the defendant to “show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.” ’ ” Jackson v. State, 791 So.2d 979, 995 (Ala.Crim.App.2000) (quoting Hardy v. State, 804 So.2d 247, 293 (Ala.Crim.App.1999), aff'd, 804 So.2d 298 (Ala.2000) (quoting in turn Rule 10.1(b), Ala. R.Crim. P.)).
“[T]he determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.”
*69 Nelson v. State, 440 So.2d 1130, 1132 (Ala.Critn.App.1983). See also Joiner v. State, 651 So.2d 1155, 1156 (Ala.Crim.App.1994) (“A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire.”). Thus, “[t]he trial court’s ruling on a motion for a change of venue will not be reversed absent an abuse of discretion.” Buskey v. State, 650 So.2d 605, 610 (Ala.Crim.App.1994). See also Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985) (“Absent a showing of abuse of discretion, a trial court’s ruling on a motion for change of venue will not be overturned.”).
“In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated ‘actual prejudice’ against him on the part of the jurors; 2) when there is ‘presumed prejudice’ resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723 (1963) ]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert.. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).
“The ‘actual prejudice’ standard is defined as follows:
“ ‘To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and “render[ed] a verdict based on the evidence presented in court.” Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].’
“Coleman v. Zant, 708 F.2d at 544.
“... Th[e ‘presumed prejudice’] standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: ‘Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.’ 778 F.2d at 1490 (emphasis added [in Hunt ]). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
“In determining whether the ‘presumed prejudice’ standard exists the trial court should look at ‘the totality of the surrounding facts.’ Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is ‘rarely’ applicable, and is reserved for only ‘extreme situations.’ Coleman v. Kemp, 778 F.2d at 1537. ‘In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.’ Coleman v. Kemp, 778 F.2d at 1490.”
Hunt, 642 So.2d at 1042-43.
“In order to show community saturation [under the ‘presumed prejudice’ stan *70 dard], the appellant must show more than the fact ‘that a case generates even widespread publicity.’ Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). ‘ “Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].” ’ Thompson v. State, supra at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977).”
Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App.1993). Thus, “ ‘[t]o justify a presumption of prejudice ..., the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice.’ ” Billups v. State, 86 So.3d 1032, 1069 (Ala.Crim.App.2009) (em-phasis omitted) (quoting United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.1990)). “Moreover, ‘the passage of time is a factor that can bring objectivity to a case in which the pretrial publicity has been extensive.’ ” Carruth v. State, 927 So.2d 866, 876 (Ala.Crim.App.2005) (quoting Ex parte Travis, 776 So.2d 874, 878 (Ala.2000)).
In this case, McCray does not argue actual prejudice; instead, he argues only presumed prejudice. He, however, failed to establish that the pretrial publicity surrounding Bachelder’s murder was so extensive and sensational in nature that a fair and impartial trial was impossible in Houston County. This Court has thoroughly reviewed the evidence presented by McCray at the- pretrial-motion hearing. Only 6 articles appeared in The Dothan Eagle and only 21 total news stories were broadcast on 2 different local television stations, and' the majority of these media reports occurred within a week of the murder, over a year before McCray’s trial. In addition, the articles and broadcasts were largely factual and objective, as opposed to accusatory, sensational, or inflammatory. Although one television broadcast did mention that McCray had a “history with the law” and one newspaper article specifically listed McCray’s prior criminal history-including a 1993 arrest for rape and sodomy and a guilty plea to the lesser offense of misdemeanor sexual misconduct, a 2003 arrest for failure to register as a sex offender,[28] and his 2003 conviction for domestic violence — the mere fact that media coverage references a defendant’s criminal history, by itself, is not sufficient to satisfy the presumed-prejudice standard. See, e.g., Jones v. State, 43 So.3d 1258 (Ala.Crim.App.2007). In addition, as noted above, McCray was cross-examined regarding his prior domestic-violence conviction, and the record further reflects that the prosecutor also cross-examined McCray about his conviction for failure to register as a sex offender.
This Court cannot say, based on the record before it, that the media coverage in this case so inflamed or saturated the community as to create an emotional tide against McCray or that it was so inherently or presumptively prejudicial as to constitute one of the “extreme situations” that warrant a presumption of prejudice.[29] *71 Therefore, the trial court properly denied McCray’s motion for a change of venue.
IX.
McCray next contends that the trial court erred in “failfing] to find and weigh certain mitigating factors.” (McCray’s brief, at 84.) McCray did not object to the trial court’s sentencing order or its findings therein; therefore, this Court will review this claim for plain error only. See Rule 45A, Ala. R.App. P.
In Reeves, this Court explained:
“ ‘In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that a death penalty statute cannot constitutionally preclude consideration of relevant mitigating factors. However, Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating. Lockett provides that a state may not exclude evidence that the defendant claims is mitigating. This does not mean that all evidence offered by the defendant as mitigating must be found to be mitigating and considered as such in the sentencing process.’
“Ex parte Hart, 612 So.2d 536, 542 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). ‘ “While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.” ’ Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d, 625 So.2d 1146 (Ala.1993). ‘Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.’ Harrell v. State, 470 So.2d 1303, 1308 (AIa.Crim.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
“ ‘ “A sentencer in a capital case may not refuse to consider or be ‘precluded from considering’ mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant’s character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, *72 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985)....’”
“Wilson v. State, 777 So.2d 856, 892 (Ala.Crim.App.1999), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).”
807 So.2d at 47-48.
In its sentencing order, the trial court stated the following regarding mitigating circumstances:
“The Court has considered all of the statutory mitigating circumstances as well as others raised by the defendant.
“(1) The Court does not find that the defendant has no significant history of prior criminal activity due to his prior convictions for Sexual Misconduct, Menacing, Domestic Violence II, and Failure to Register as a Sex Offender.
“(2) The Court does not find that the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance although it appears that the motive may have been the break up of the relationship of the parties.
“(3) The Court does not find that the victim was a participant in the defendant’s conduct or consented to the act as is obvious.
“(4) The Court does not find that the defendant was an accomplice in a capital offense committed by another as he was the sole participant.
“(5) The Court does not find that the defendant acted under extreme duress or under the substantial domination of another person.
“(6) The Court does not find that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
“(7) The Court does not find that the age of the defendant was a mitigating circumstance in that he was 36 years old at the time of the offense.
“(8) The Court does find some evidence of each of the 18 particular mitigating circumstances raised by the defendant and set out in defendant’s requested jury charge # 16, a copy of said list which is attached hereto as ‘Exhibit A’ and adopted by reference.” [30]
(C. 433-34.)
McCray first argues that the trial court “improperly discounted some of the mitigating evidence” instead of finding the existence of all 18 nonstatutory mitigating circumstances he offered. (McCray’s brief, at 86.) This assertion is refuted by the record. Contrary to McCray’s contention, the trial court stated that it found “some evidence” to support “each of’ the 18 nonstatutory mitigating circumstances offered by McCray. Thus, the trial court properly considered and found to exist each of the 18 nonstatutory mitigating circumstances that McCray offered at trial.
McCray also argues that the trial court erred in not finding that the murder was committed while he was under the influence of extreme emotional disturbance because his testimony at the guilt phase of the trial established that he had acted solely as a result of heat of passion. However, “[m]erely because an accused *73 proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.” Harrell v. State, 470 So.2d 1303, 1308 (Ala.Crim.App.1984), aff'd, 470 So.2d 1309 (Ala.1985). “The factual determination of the existence or nonexistence of a mitigating circumstance is within the sound discretion of the trial judge where the evidence in that regard is in conflict.” Wesley v. State, 575 So.2d 108, 121 (Ala.Crim.App.1989), rev’d on other grounds, 575 So.2d 127 (Ala.1990). The evidence regarding McCray’s emotional state at the time, of the murder was sharply conflicting. Although McCray claimed that he acted solely out of heat of passion, the State presented a plethora of evidence rebutting McCray’s version of events and establishing that McCray intentionally murdered Bachelder. In fact, McCray admitted on cross-examination that he wanted Bachelder to die to prevent her from identifying him as her attacker. Considering the entire record, including the fact that the jury expressly rejected McCray’s heat-of-passion defense, this Court finds no error in the trial court’s rejection of the existence of this statutory mitigating circumstance.
Finally, McCray argues that the trial court erred in not finding as a nonstatuto-ry mitigating circumstance that he had low intellectual functioning. However, McCray presented no evidence, either during the guilt phase or the penalty phase of the trial, that he had low intellectual functioning. The record indicates that McCray completed high school; that he could read and write; and that he was gainfully employed. Although McCray’s sister testified at the penalty phase of the trial that McCray was in special-education classes throughout his youth, no evidence was presented as to the reason McCray was in special-education classes, i.e., whether it was because of low intellectual functioning or for some other reason unrelated to his intellectual functioning. Therefore, this Court finds no error on the part of the trial court in not finding as a nonstatutory mitigating circumstance McCray had low intellectual functioning.
It is clear from a review of the entire record that the trial court understood its duty to consider all the evidence presented and that it did so in this case. Therefore, this Court finds no error, plain or otherwise, in the trial court’s findings regarding mitigating circumstances.
X.
McCray next contends that the trial court erred during its penalty-phase instructions by characterizing the jury’s sentencing verdict as advisory or as a recommendation. Specifically, he argues that such characterization misled the jury as to its role in the sentencing process and diminished the jurors’ sense of responsibility in sentencing. However, this Court has repeatedly held that accurately informing the jury that its sentencing verdict is advisory or is a recommendation, see § 13A-5-47, Ala.Code 1975, does not diminish the jury’s role in sentencing or lessen the jury’s responsibility. See, e.g., Doster v. State, 72 So.3d 50 (Ala.Crim.App.2010); Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009); Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007); Deardorff v. State, 6 So.3d 1205 (Ala.Crim.App.2004), aff'd, 6 So.3d 1235 (Ala.2008); Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001); and Stewart v. State, 730 So.2d 1203 (Ala.Crim.App.1996) (opinion on third return to remand), affd, 730 So.2d 1246 (Ala.1999); and the cases cited therein. Therefore, this Court finds no error as to this claim.
XI.
McCray also contends that “the trial court erred when it refused to narrow *74 adequately the class of death eligible offenders.” (McCray’s brief, at 89.) Specifically, he argues that: (1) the trial court erred in denying his motion to prohibit the use of burglary as both an aggravating circumstance for purposes of determining sentence and as an element to elevate the murder to a capital offense, a practice referred to as “double counting”; and (2) the trial court erred in denying his motion to prohibit application of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel as compared to other capital offenses on the ground that the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad on its face.
Both of these claims have previously been decided adversely to McCray. In Vanpelt, this Court rejected a challenge to double counting as follows:
“Contrary to Vanpelt’s assertions, there is no constitutional or statutory prohibition against double counting certain circumstances as both an element of the offense and an aggravating circumstance. See § 13A-5-45(e), Ala. Code 1975 (providing that ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing’). The United States Supreme Court, the Alabama Supreme Court, and this court have all upheld the practice of double counting. See Lowenfield, v. Phelps, 484 U.S. 231, 241-46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (‘The fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.’); Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (‘The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).’); Ex parte Kennedy, 472 So.2d 1106, 1108 (Ala.1985) (rejecting a constitutional challenge to double counting); Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007); Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007); Jones v. State, 946 So.2d 903, 928 (Ala.Crim.App.2006); Peraita v. State, 897 So.2d 1161, 1220-21 (Ala.Crim.App.2003); Coral v. State, 628 So.2d 954 (Ala.Crim.App.1992); Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991). Because double counting is constitutionally permitted and statutorily required, Vanpelt is not entitled to any relief on this issue. § 13A-5-45(e), Ala. Code 1975.”
74 So.3d at 89. In addition, in Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004), this Court rejected an identical constitutional challenge to the especially heinous, atrocious, or cruel aggravating circumstance, noting:
“With respect to Minor’s constitutional challenge to the heinous, atrocious, or cruel aggravating circumstance in § 13A-5-49(8), Ala.Code 1975, this Court has repeatedly upheld that circumstance against similar challenges. See Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002); Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000); Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000); Bui v. State, 551 So.2d 1094 (Ala.Crim.App.1988), aff'd, 551 So.2d 1125 (Ala.1989), judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); and Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.1989).”
914 So.2d at 437. See also Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005); *75 Lindsey v. Thigpen, 875 F.2d 1509, 1513-1514 (11th Cir.1989) (holding that Alabama constriction of the especially heinous, atrocious or cruel aggravating circumstance to those conscienceless or pitiless homicides that are unnecessarily torturous to the victim satisfies the narrowing requirement of the Eighth Amendment).
Because McCray’s arguments are contrary to established precedent, and he has offered this Court no principled reason to question the validity of that precedent, these issues do not entitle him to any relief.
XII.
McCray next contends that the trial court committed several errors during jury selection that, he says, denied him an impartial jury.
Initially, this Court notes that “[a] trial court is vested with discretion in the conduct of a trial, and appellate courts will not interfere with the exercise of that discretion unless it clearly appears that there has been an abuse of discretion.” Carden v. State, 621 So.2d 342, 346 (Ala.Crim.App.1992). Moreover, “the process of voir dire examination remains within the sound discretion of the trial court.” State v. Watts, 35 So.3d 1, 4 (Ala.Crim.App.2009). With these principles in mind, this Court will address each of McCray’s claims in turn.
A.
First, McCray argues that the trial court erred in denying his motion for disclosure of any and all information in the State’s possession regarding prospective jurors that may have been favorable to the defense. He maintains that the trial court’s denial of his motion hampered his ability to assess prospective jurors during jury selection, violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and denied him his constitutional rights to due process, a fair trial, and an impartial jury. This Court disagrees.
It is well settled that “[t]he State has no duty to disclose information concerning prospective jurors.” McGriff v. State, 908 So.2d 961, 981 (Ala.Crim.App.2000), rev’d on other grounds, 908 So.2d 1024 (Ala.2004). “This court has held that arrest and conviction records of potential jurors do not qualify as the type of discoverable evidence that falls within the scope of Brady and that a trial court will not be held in error for denying an appellant’s motion to discover such documents.” Kelley v. State, 602 So.2d 473, 477 (Ala.Crim.App.1992). “Also, the state has no duty to disclose information that is available to the appellant from another souree[,]” such as through voir dire examination. Id. at 478. As this Court recently explained in Doster v. State, 72 So.3d 50 (Ala.Crim.App.2010):
“ ‘The traditional common-law rule that, absent a statute or rule of practice providing otherwise, or (in some jurisdictions) other exceptional circumstance, defense counsel in a criminal case has no right of access to information in the possession of the prosecution is consistent with most of the decisions involving prosecution information regarding prospective jurors. Thus, in most of the jurisdictions in which the issue has arisen, the courts have held that at least in the particular circumstances presented, disclosure to defense counsel of prosecution information regarding prospective jurors was not required, whether the information in question related to a prospective juror’s experience or voting record on prior juries, to a prospective juror’s criminal record or other private information obtained from the record or investigative re *76 ports of a law enforcement agency, or to miscellaneous or unspecified information.’ ”
72 So.3d at 79-80 (quoting Annot. Right of Defense in Criminal Prosecution to Disclosure of Prosecution Information Regarding Prospective Jurors, 86 A.L.R.8d 571 (1978)).
Here, nothing in the record indicates that McCray was prevented from discovering information about prospective jurors during voir dire examination. Rather, the record indicates that both parties were given wide latitude in their voir dire questioning. Indeed, the record reflects that the trial court granted McCray’s request for individually sequestered voir dire, specifically allowing individual questioning regarding “critical and material” issues. (August 7, 2006, Motion Hearing, R. 34.) Therefore, the trial court did not err in denying McCray’s motion for disclosure of any and all information in the State’s possession regarding prospective jurors that may have been favorable to the defense.
B.
Second, McCray argues that the trial court erred in allowing prospective jurors to be “death-qualified.” McCray also argues that the trial court erred in removing for cause three prospective jurors — O.T., S.C., and C.H. — who indicated during voir dire examination that they could never vote to impose the death penalty under any circumstances because those prospective jurors were not asked whether they could set aside their feelings about the death penalty and render a verdict based on the law and evidence. According to McCray, without asking the jurors whether they could set aside their feelings about the death penalty and render a verdict based on the law and evidence, it was not established that those prospective jurors had an absolute bias necessary to warrant a challenge for cause.
With regard to McCray’s general argument regarding the propriety of death-qualification, the record reflects that McCray did not file a pretrial motion or otherwise object to death-qualifying the prospective jurors. Therefore, this Court reviews this issue for plain error only. See Rule 45A, Ala. R.App. P. Although McCray acknowledges that death-qualification is constitutionally permissible in capital-murder cases, see Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), he nonetheless asserts that death-qualified jurors are more prone to convict and that death-qualifying prospective jurors “disproportionately excludes minorities and women,” thus depriving him of an impartial jury. (McCray’s brief, at 94.) However, in Davis, this Court rejected this identical claim as follows:
“A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.) Williams) Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).”
718 So.2d at 1157 (footnote omitted). See also Vanpelt, 74 So.3d at 50. Because death-qualification of prospective jurors is constitutionally permissible, this Court finds no error, much less plain error, in *77 the trial court’s allowing the prospective jurors to be “death-qualified.”
Regarding McCray’s argument that the trial court erred in removing for cause prospective jurors O.T., S.C., and C.H., all of whom stated that they could not vote to impose the death penalty under any circumstances, the record reflects that, after voir dire examination, when the parties began challenging for cause various prospective jurors, defense counsel objected “to the excusal of any juror on the ground that they cannot vote for the death penalty” on the ground that it violated McCray’s constitutional rights. (R. 202.) The trial court overruled the objection and removed for cause at the State’s request O.T., S.C., and C.H.[31] The record reflects that the trial court also removed for cause at the request of the State one prospective juror who had indicated during voir dire that she could never vote for life imprisonment without the possibility of parole. McCray argues on appeal that the trial court’s removal of O.T., S.C., and C.H. for cause was error because those prospective jurors were not properly questioned during voir dire examination as to whether they could set aside their feelings about the death penalty and render a verdict based on the law as instructed by the court.
As noted above, “[b]road discretion is vested with the trial court in determining whether or not to sustain challenges for cause.” Ex parte Nettles, 435 So.2d 151, 154 (Ala.1983). Section 12-16-152, Ala.Code 1975, provides:
“On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment or thinks that a conviction should not be had on circumstantial evidence, which cause of challenge may be proved by the oath of the person or by other evidence.”
Moreover, as this Court explained in Saunders v. State, 10 So.3d 53 (Ala.Crim.App.2007), regarding challenges for cause based on a prospective juror’s opposition to the death penalty:
“ ‘The “original constitutional yardstick” on this issue was described in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Under Witherspoon, before a juror could be removed for cause based on the juror’s views on the death penalty, the juror had to make it unmistakably clear that he or she would automatically vote against the death penalty and that his or her feelings on that issue would therefore prevent the juror from making an impartial decision on guilt. However, this is no longer the test. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the proper standard for determining whether a venire-member should be excluded for cause because of opposition to the death penalty is whether the venire-member’s views would “ ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ” [Quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).] The Supreme Court has expressly stated that juror bias does not have to be proven with “unmistakable clarity.” Darden v. Wainwright, 477 *78 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).’
“Pressley v. State, 770 So.2d 115, 127 (Ala.Crim.App.1999), aff'd, 770 So.2d 143 (Ala.2000). See also Uttecht v. Brown, 551 U.S. 1, 9, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007) (‘[A] juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible.’).”
10 So.3d at 75-76. “[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judge to disqualify a juror.” Ex parte Whisenhant, 555 So.2d 235, 241 (Ala.1989). “[I]n order to determine whether the trial judge’s exercise of discretion [regarding a challenge for cause] was proper, this Court will look to the questions directed to and answers given by the prospective juror on voir dire.” Holliday v. State, 751 So.2d 533, 535 (Ala.Crim.App.1999). However, this Court bears in mind that
“determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made ‘unmistakably clear’; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their trae feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... [T]his is why deference must be paid to the trial judge who sees and hears the juror.”
Wainwright v. Witt, 469 U.S. 412, 424-25, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (footnote omitted).
The record reflects that during the trial court’s initial questioning of the venire, the court asked the following:
“Are there any of you for any reason whatsoever who could not recommend the death penalty even though you were convinced beyond a reasonable doubt under the facts and the law as given to you by the Court that such was warranted? In other words, are there any of you who have a fixed judgment against the death penalty where you could not recommend the death penalty no matter what the facts are in the case?”
(R. 26.) Six prospective jurors raised their hands in response to this question. Three of those jurors were later excused by the trial court for medical and other reasons unrelated to their views on the death penalty, and O.T., S.C., and C.H. were removed for cause. The record reflects that the trial court also asked prospective jurors the converse question— “are there any of you who for any reason could not recommend life without parole, even though, under the evidence and law given to you by the Court, you are not convinced beyond a reasonable doubt that the defendant should receive the death penalty?” (R. 28.) At this point, no prospective jurors responded to this question.
After explaining in more detail the different phases of a capital trial, the trial court asked the questions again, first asking:
“Are there any of you who would not be able to follow the judge’s instructions regarding weighing aggravating circumstances versus mitigating circumstances in considering punishment in this case so that you would be unable to recommend *79 life without parole instead of the death penalty even though you were not convinced beyond a reasonable doubt by the evidence that the defendant should receive the death penalty? In other words, are there any of you who could not recommend life without parole instead of the death penalty even though the evidence did not warrant the death penalty?
“That poses the same question, but using the phraseology about aggravating and mitigating circumstances. And it asks whether any of you could not recommend life without parole even though the evidence and the law indicated that the aggravating circumstances did not outweigh the mitigating circumstances. Does that apply to anyone? The same question in a little more specific manner.”
(R. 29-30.) Again, no prospective jurors responded. The trial court then asked:
“[A]re there any of you who could not recommend the death penalty instead of life without parole if the State did prove to you beyond a reasonable doubt aggravating circumstances which outweighed the mitigating circumstances? The very reverse.”
(R. 30-31.) At this point, a prospective juror asked for further explanation regarding aggravating and mitigating circumstances. The trial court then explained aggravating and mitigating circumstances in more detail, and one prospective juror indicated that she would never consider, or vote for, life imprisonment without the possibility of parole in any capital case. No other prospective jurors responded. When the prosecutor questioned the venire similarly, one additional prospective juror, J.C., see note 31, supra, indicated that he had “concerns” about the death penalty. (R. 75.)
During individual voir dire examination of O.T., the following occurred:
“THE COURT: [O.T.], I believe you were one of those that responded that you could not recommend the death penalty under any circumstances; is that correct?
“[O.T.]: That’s correct.
“THE COURT: So if the State proved beyond a reasonable doubt basically under the evidence — the law and the evidence indicated that the defendant should receive the death penalty, you could not do that; is that correct?
“[O.T.]: I could not do what?
“THE COURT: You could not recommend the death penalty?
“[O.T.]: I would not recommend it, no. I would follow the law, but I wouldn’t—
“THE COURT: You just personally could not do that?
“[O.T.]: Right.
“THE COURT: Is that based on, I guess, your moral convictions and so forth?
“[O.T.]: Right.
“THE COURT: Any questions, [prosecutor]?
“[Prosecutor]: No, Your Honor.
“THE COURT: Or, [defense counsel]?
“[Defense counsel]: Yes. [O.T.], would that be true in any death penalty case, no matter how many people got killed or how bad the circumstances were?
“[O.T.]: It’s true what I believe, not what has to do with the law.
“[Defense counsel]: Okay. No further questions.”
(R. 179-80.)
During individual voir dire examination of S.C., the following occurred:
*80 “THE COURT: And also,[32] I believe you indicated that you would not be able to recommend the death penalty in a case such as this or I guess in any death penalty case?
“[S.C.]: I would have a problem. As a Christian, I don’t think I have a right to choose when someone dies.
“THE COURT: And so you could not do that in a death penalty case?
“[S.C.]: I don’t believe I could.
“THE COURT: Any questions, [prosecutor]?
“[Prosecutor]: No. Thank you for your honesty.
“THE COURT: [Defense counsel]?
“[Defense counsel]: [S.C.], would that be true in any death penalty case? No matter what the circumstances, you just could not—
“[S.C.]: I would think so. I haven’t seen where it could happen in a case, but that’s the way I feel.
“THE COURT: Thank you, [S.C.].”
(R. 181-82.)
During individual voir dire examination of C.H., the following occurred:
“THE COURT: [C.H.], I believe you had indicated that you could not render the death penalty in a case?
“[C.H.]: Yes. The reason why, I take it too personally, and I take in consideration my kids and I take into consideration the two mothers, the deceased’s mother and the defendant’s mother. And to be put in that situation, I wouldn’t know what to do, but I wouldn’t want to be the one that say[s] death and it be on my conscience. You know what I’m saying?
“THE COURT: In other words, feeling like a mother on each side of the issue, you feel like you could not render a death penalty verdict?
“[C.H.]: Right.
“THE COURT: Could you do it in any kind of case or—
“[C.H.]: As long as it’s not death, yeah. I could — yeah, I could do it you know, anything but death.
“THE COURT: In other words, not in a death penalty case?
“[C.H.]: Not in a death penalty.
“THE COURT: Any questions, [prosecutor]?
“[Prosecutor]: No. Thank you, Your Honor.
“THE COURT: [Defense counsel]?
“[Defense counsel]: None. Thank you.”
(R. 197-98.)
Although none of these prospective jurors were specifically asked “whether they ‘could follow the court’s instructions and obey [their] oath notwithstanding [their] views on capital punishment,” (McCray’s brief, at 95), in those exact words, the import of the questions posed and answers given by these prospective jurors during both group voir dire and individual voir dire show that their views on the death penalty would have substantially impaired the performance of their duties as jurors. See, e.g., Killingsworth v. State, 82 So.3d 716 (Ala.Crim.App.2009); Sneed v. State, 1 So.3d 104 (Ala.Crim.App.2007); and Jones v. State, 43 So.3d 1258 (Ala.Crim.App.2007). Therefore, the trial court correctly removed these jurors for cause.
C.
Third, McCray argues that the trial court erred in denying his motion requesting the use of juror questionnaires. He maintains that the use of juror question- *81 nafres would have allowed him to learn more about the prospective jurors’ backgrounds and attitudes. From there, McCray argues that the questionnaires would have allowed him to make more informed choices in selecting the jury and “would have safeguarded the heightened reliability that was required for [his] capital trial.” (McCray’s brief, at 96.) According to McCray, the failure to allow the use of juror questionnaires violated his constitutional rights.
The record reflects that McCray filed a pretrial motion requesting the use of juror questionnaires and attached to that motion a proposed juror questionnaire. The trial court summarily denied the motion without comment at the August 7, 2006 motion hearing. It is well settled that “[a] trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court’s decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion.” Ex parte Land, 678 So.2d 224, 242 (Ala.1996). “[T]he method of voir dire examination is within the discretion of the trial court[.]” Hodges v. State, 856 So.2d 875, 913 (Ala.Crim.App.2001), aff'd, 856 So.2d 936 (Ala.2003). Both this Court and the Alabama Supreme Court have repeatedly recognized that “trial courts are not required to allow the use of jury questionnaires, even in capital cases.” Maples v. State, 758 So.2d 1, 51 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala.1999). See also Ex parte Land, supra; Miller v. State, 63 So.3d 676 (Ala.Crim.App.2010); Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009); Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007), aff'd, 11 So.3d 933 (Ala.2008); Lee v. State, 898 So.2d 790 (Ala.Crim.App.2001); and Hodges, supra.
As noted previously, the trial court conducted voir dire examination initially as a group but then allowed the parties to conduct individual voir dire examination of certain prospective jurors when necessary. The record reflects that the parties were not limited in any way in their questioning of prospective jurors, either during group or individual voir dire. Finally, McCray has failed to indicate what, if any, information about prospective jurors he was unable to discover without juror questionnaires. Therefore, McCray has not established that the trial court abused its discretion in denying McCray’s motion for the use of juror questionnaires.
XIII.
McCray next contends that Alabama’s method of execution — lethal injection— constitutes cruel and unusual punishment. McCray raised this issue in a pretrial motion but did not present any evidence in support of it, and the trial court denied the motion.
On appeal, in a one-paragraph argument, McCray recognizes that the United States Supreme Court has upheld lethal injection as a constitutional method of execution, see Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), but nonetheless argues that Alabama’s “lethal injection protocols are still subject to challenge because [they are] not ‘substantially similar’ ” to Kentucky’s protocols specifically upheld in Baze. (McCray’s brief, at 97.) See Baze, supra at 61, 128 S.Ct. 1520 (“A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets th[e] standard” for cruel and unusual punishment.). However, Alabama uses the same three-drug protocol as does Kentucky, and this Court has specifically held that Alabama’s protocols are, contrary to McCray’s contention, substantially similar to Kentucky’s protocols. See Phillips v. State, 65 So.3d 971 (Ala.Crim.App.2010). *82 In addition, both this Court and the Alabama Supreme Court have upheld Alabama’s method of execution. See Ex parte Belisle, 11 So.3d 323, 339 (Ala.2008); Doster, 72 So.3d at 104; and Phillips, supra, and the cases cited therein. Therefore, McCray’s claim in this regard is meritless.
XIV.
McCray also contends that his death sentence violates the United States Supreme Court’s opinion in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Specifically, he argues that the aggravating circumstances found by the jury[33] were not charged in his indictment and that the record does not reflect that the jury unanimously found that the aggravating circumstances outweighed the mitigating circumstances, a finding of fact he claims is required by Ring to be made by the jury. McCray raised these arguments in a pretrial motion that was properly denied by the trial court,
Both this Court and the Alabama Supreme Court have repeatedly rejected identical challenges. See, e.g., Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Mitchell v. State, 84 So.3d 968 (Ala.Crim.App.2010); Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009); Sharifi v. State, 993 So.2d 907 (Ala.Crim.App.2008); Sneed v. State, 1 So.3d 104 (Ala.CrimApp.2007); and Lewis v. State, 24 So.3d 480 (Ala.Crim.App.2006), aff'd, 24 So.3d 540 (Ala.2009). Contrary to McCray’s contentions, “aggravating circumstances do not have to be alleged in the indictment,” Stallworth v. State, 868 So.2d 1128, 1186 (Ala.Crim.App. 2001), and “the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense,” Ex parie Waldrop, 859 So.2d at 1190, that must be found by a jury. Therefore, McCray’s death sentence does not violate Ring, and McCray is entitled to no relief on this claim.
Moreover, McCray’s assertion that no aggravating circumstances were charged in the indictment is refuted by the record. Contrary to McCray’s assertion to this Court, one of the aggravating circumstances — “that [the] capital offense was committed while the defendant was engaged ... in the commission of ... [a] burglary,” see § 13A-5-49(4), Ala.Code 1975, — was charged in the indictment. See Bryant v. State, 951 So.2d 732, 749 (Ala. Crim.App.2003) (rejecting an identical argument because the “indictment returned against Bryant advised him of the crime with which he was charged — the capital offense of murder during kidnapping, in violation of § 13A-5-40(a)(l), Ala.Code 1975 — and [thus] [i]ncluded in the indictment was the aggravating circumstance of kidnapping in the first degree ...”). Therefore, McCray’s argument is without merit and does not entitle him to any relief.
XV.
Finally, McCray contends that the cumulative effect of all the errors was to deny him a fair trial and warrants reversal his conviction and sentence of death. *83 “[W]hile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, [Ala. R.App. P.,] if the accumulated errors have ‘probably injuriously affected substantial rights of the parties,’ then the cumulative effect of the errors may require reversal.” Ex parte Woods, 789 So.2d at 942-43 n. 1. Although this Court has found and/or assumed errors in McCray’s trial, as explained fully above, it has thoroughly reviewed the record and concludes that the cumulative effect of the errors, if any, did not probably injuriously affect McCray’s substantial rights. Therefore, this issue does not entitle McCray any relief.
XVI.
Pursuant to § 13A-5-53, Ala.Code 1975, this Court is required to address the propriety of McCray’s conviction and sentence of death. McCray was indicted for, and convicted of, murder made capital because it was committed during the course of a burglary. See 13A-5-40(a)(4), Ala.Code 1975.
The record does not reflect that McCray’s sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975.
The trial court correctly found that the aggravating circumstances outweighed the mitigating circumstances. In its sentencing order, the trial court stated that it found three aggravating circumstances: (1)McCray had previously been convicted of another capital offense or felony involving the use or threat of violence to the person, § 13A-5-49(2), Ala.Code 1975; (2) McCray committed the capital offense while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a burglary, § 13A-5-49(4), Ala.Code 1975; and (3) the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5^9(8), Ala.Code 1975. The trial court then considered each of the statutory mitigating circumstances and found that none applied in this case. However, the trial court did find that the following nonstatutory mitigating circumstances were applicable:
(1) McCray had custody of his two youngest sons;
(2) McCray’s oldest son lived with him;
(3) McCray was entrusted with the care of Bachelder’s children at times when she was away from her mobile home;
(4) McCray is a good brother to his siblings;
(5) McCray is a good son;
(6) McCray has been a good father to his children;
(7) McCray is a good uncle;
(8) McCray helped take care of a friend of his after she was diagnosed with cancer;
(9) McCray has an extensive network of friends and family that will continue while he is incarcerated;
(10) At the time of his arrest, McCray was gainfully employed;
(11) McCray served in the Pansey Volunteer Fire Department;
(12) McCray has been a member of Pilgrim Rest Baptist Church;
(13) McCray gave up his right to remain silent when questioned by law-enforcement officers;
(14) McCray gave up his right to remain silent when he chose to testify in court;
(15) In his trial testimony, McCray admitted to killing Bachelder;
(16) McCray behaved appropriately during his trial;
(17) Society will be adequately protected by McCray serving a sentence of life in prison without parole; and
*84 (18) McCray is a human being.
Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to reweigh the aggravating circumstances and the mitigating circumstances in order to determine whether McCray’s death sentence is proper. After independently weighing the aggravating and mitigating circumstances, this Court finds that McCray’s sentence of death is appropriate.
As required by § 13A-5-53(b)(3), Ala. Code 1975, this Court must also determine whether McCray’s sentence is excessive or disproportionate when compared to the penalty imposed in similar cases. In this case, McCray was convicted of murder made capital because it was committed during the course of a burglary. Sentences of death have been imposed for similar crimes throughout the State. See, e.g., Morris v. State, 60 So.3d 326 (Ala.Crim.App.2010); Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007); Saunders v. State, 10 So.3d 53 (Ala.Crim.App.2007); Brown v. State, 982 So.2d 565 (Ala.Crim. App.2006); Beckworth v. State, 946 So.2d 490 (Ala.Crim.App.2005); Walker v. State, 932 So.2d 140 (Ala.Crim.App.2004), aff'd, 972 So.2d 737 (Ala.2007); Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001); and the eases cited therein. Therefore, this Court finds that McCray’s death sentence is neither excessive nor disproportionate.
Finally, this Court has searched the record for any error that may have adversely affected McCray’s substantial rights and has found none.[34] See Rule 45A, Ala. R.App. P.
Based on the foregoing, McCray’s capital-murder conviction and his sentence of death are affirmed.
AFFIRMED.
WISE, P.J., and WELCH, KELLUM, and MAIN, JJ., concur.

. Officer Miller said the back door was also locked.

. As explained later in this opinion, McCray testified at trial that Bachelder always carried a box cutter on her person.

. It appears from the record that another medical examiner, who was no longer employed with DFS at the time of McCray's trial, actually performed the autopsy on Bachelder.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The record indicates that the lengthy delay in taking McCray's statement was because McCray took a polygraph examination, information that was not, per Alabama law, submitted to the jury. See, e.g., Ex parte Hinton, 548 So.2d 562 (Ala.1989).

. Another 56 of the first 100 names are also crossed out on the strike list; however, those names have notations next to them indicating that they were either excused by the court, challenged for cause, or struck by one of the parties.

. We note that McCray requested in his motion that "voir dire and jury selection" be recorded, but he did not request that the roll call be recorded. (C. 73.) In addition, Rule 19.4(a), Ala. R.Crim. P., requires court reporters to take full stenographic notes of "voir dire of the jury” in all capital cases but does not specifically require recordation of the roll call of the jury before voir dire begins.

.The record reflects that the court and both parties initially questioned the entire venire as a group; during that questioning, the prospective jurors were told that they did not have to answer any questions in front of the entire venire if they did not want to and were instructed to come to the bench at the conclusion of group voir dire to answer any questions they had not answered. In addition, following group voir dire, the trial court specifically asked several veniremembers to come to the bench for further questioning on such issues as media coverage and the death penalty. The record reflects that 21 venire-members were questioned individually.

. Defense counsel initially argued that the State had struck the only African-Americans remaining on the venire; however, after the prosecutor pointed out that one African-American was, in fact, seated on the jury, defense counsel changed his argument.

. In addition, in that case, this Court remanded for the trial court to determine only whether a prima facie case of gender discrimination in striking the jury had been established; this Court did not hold that there had, in fact, been any gender discrimination.

. This Court notes that McCray argues that only three men who sat on his jury answered no questions during voir dire; however, a review of the record reveals that there were actually four men who sat on the jury who did not answer any questions during voir dire.

. McCray first cited McGahee to this Court at oral argument. This Court then asked the parties to file supplemental briefs addressing that opinion.

. In McGahee, the Court of Appeals was focused on the third step of the Batson inquiry, not the first step, as is the case here; the State had removed all African-Americans on the venire either through its challenges for cause or its peremptory strikes, while here one African-American sat on McCray's jury; and at least one reason given by the State for two of its strikes was clearly racial and a general reason given by the State for several of its strikes was unsupported by the record.

. The prosecutor also impeached McCray with other prior convictions in addition to the conviction for domestic violence.

" 4 Some courts have simply declared that evidence of a victim’s state of mind is admissible. See State v. Radabaugh, 93 Idaho 727, 731, 471 P.2d 582, 586 (1970) (‘Evidence tending to show the mental state of the victim and ill-feeling or hostility between decedent and defendant is admissible.'); State v. Alston, 341 N.C. 198, 230, 461 S.E.2d 687, 704 (1995) ('[A] murder victim’s statements falling within the state of mind exception to the hearsay rule are highly relevant to show the status of the victim’s relationship to the defendant.’)."

. In a footnote in his brief, McCray states that the trial court granted his pretrial motion to prohibit the State from introducing victim-impact evidence at the guilt phase of his trial. However, the record reflects that McCray filed a motion to prohibit the State from presenting victim-impact evidence during the penalty phase of his trial, not during the guilt phase of the trial. Although the trial court noted on the case-action-summary sheet that the motion was granted "as to guilt stage” (C. 144), this notation is obviously based on a misunderstanding of the argument McCray actually presented in his motion. McCray never argued in the motion that the State should be prohibited from presenting victim-impact evidence during the guilt phase of the trial.

. It appears from the record that, at the time of the murder, Bachelder's other son was visiting his biological father out of state.

. This Court notes that McCray's entire argument in this regard is nothing but a quotation of the comment, with no argument as to why he believes the comment was improper nor any citation to authority.

. The prosecutor here is quoting a statement McCray made during his interview with police regarding how much he loved Bachelder.

. For example, McCray claimed on direct examination that he had placed the dog leash around Bachelder’s throat before she allegedly got the butcher knife out of the drawer. However, such a claim is implausible because under that theory Bachelder — after having McCray wrap a dog leash around her neck during an argument — took the time to go to the kitchen and get a butcher knife out of a drawer, but did not bother to take the time to remove a leash from around her neck.

. The record indicates that defense counsel was speaking here; however, it is clear that was a typographical error.

. The record reflects that defense counsel has previously worked as a district attorney and had also previously been a circuit court judge.

. This Court holds that G.F.’s failure to answer questions regarding her prior criminal experience truthfully during voir dire would be a race-neutral reason justifying a peremptory challenge. See Brown v. State, 982 So.2d 565, 586 (Ala.Crim.App.2006) (holding that potential jurors' failure to disclose prior convictions is a race-neutral reason).

. This Court has reviewed the videotape of McCray’s statement, and it supports Detective Meredith’s testimony that he reminded *58 McCray of his rights before the interrogation began.

. The videotape was actually admitted at the pretrial suppression hearing.

. McCray’s previous objection was to the voluntariness of his statement.

. The videotape is approximately 15 minutes long and contains no audio. It begins outside Bachelder’s mobile home and proceeds in the front door, through the living room and kitchen and down the hallway to where Bachelder's body was found. It also shows the three bedrooms in the mobile home and the bathroom.

. The pretrial hearings are separately paginated. When citing to testimony or argument from these hearings, this Court states the date of the hearing, followed by the appropriate page number.

. The article stated that this charge had been dismissed; however, McCray testified at trial that he had, in fact, been convicted of failure to register as a sex offender.

. Although not argued by McCray, this Court also finds no evidence of actual prejudice. The record reflects that only 12 of the initial 70 veniremembers had read or seen any me *71 dia reports about the case and that only 3 of those indicated that they had formed opinions about the case that they could not set aside. However, those three prospective jurors were removed for cause by the trial court.

. See Part XVI of this opinion, wherein we set forth the 18 nonstatutory mitigating circumstances found by the trial court.

. The trial court also removed for cause prospective juror J.C. on the same ground, but McCray does not challenge on appeal the trial court’s removal of J.C.

. The trial court initially questioned S.C. about pretrial publicity.

. The jury was given a special verdict form at the penalty phase of the trial regarding aggravating circumstances, in which the jury indicated that it had found beyond a reasonable doubt the existence of three aggravating circumstances: (1) that McCray had previously been convicted of a felony involving the use or threat of violence to the person; (2) that McCray had committed the capital offense while he was engaged in the commission of or an attempt to commit or flight after committing or attempt to commit burglary; and (3) that the capital offense was especially heinous, atrocious, or cruel as compared to other capital offenses.

. In this regard, this Court notes that the indictment charged, in relevant part, that McCray intentionally murdered Bachelder "during the time that [he] knowingly and unlawfully entered or remained” in Bachelder’s dwelling and that McCray was "armed with an explosive or deadly weapon.” (C. 11.) In other words, the burglary portion of the indictment charged McCray pursuant to the alternative contained in § 13A — 7—5(a)(1), Ala. Code 1975. However, the trial court did not charge the jury on this alternative in its guilt-phase instructions. Rather, the trial court instructed the jury that it could find McCray guilty if it found that McCray had caused physical injury to any person not a participant in the crime or if he had used or threatened the immediate use of a dangerous instrument, thus effectively amending the indictment to charge the alternatives contained in § 13A-7-5(a)(2) and (a)(3), Ala.Code 1975. Although the trial court should have charged the jury on the burglary alternative alleged in the indictment, this Court does not find this omission to be fatal. " '[A] material variance will exist if the indictment charges an offense committed by one means and the trial court's jury charge addresses a separate and contradictory means.’ ” Gibson v. State, 488 So.2d 38, 40 (Ala.Crim.App.1986) (emphasis added). However, "[t]he one apparent exception to this rule of variance where the statute contains alternative methods of committing the offense is where the alternative methods are not contradictory and do not contain separate and distinct elements of proof.” Id. Subsections (a)(1), (a)(2), and (a)(3) in § 13A-7-5, Ala.Code 1975, are alternative methods of proving the offense of burglary in the first degree, but they are not contradictory methods. Indeed, in this case, the State’s evidence actually proved all three alternatives. Thus, the trial court’s oral charge here did not amend the indictment to charge a new or different offense that was not encompassed within the indictment, nor did it prejudice the substantial rights of McCray. See Rule 13.5(a), Ala. R.Crim. P., and Rule 45A, Ala. R.App. P.